HIGGINBOTHAM-BAILEY-LOGAN CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 4691.   Promulgated October 7, 1927.

1. Petitioner reduced its gross sales by 50 per centum of the sales price of goods which it had been notified, prior to the close of the taxable year, would be returned. The action of the Commissioner in disallowing such deduction approved.

2. It was the custom of petitioner always to take advantage of cash discounts and during its existence it had computed its inventories by giving effect to such discounts. *Held,* that such inventories may properly be used in computing taxable income, the effect being to allow cash discount as a deduction when the goods were sold and not when payment is made.

3. Weight is to be given to consistency of method in taking inventories.

4. Amount paid by petitioner to secure cancellation of a lease which it had previously executed upon its building, the space being necessary to the conduct of its business, *held* to be deductible in the year incurred and paid and not to be spread over unexpired period of the lease.

5. Adjustment of interest and insurance payments on basis of prorating such payments over the period for which made, approved.

6. Principles governing ascertainment of worthlessness of indebtedness and proof thereof discussed. Some of debts claimed as deductions allowed and others disallowed.

7. Assessment under section 328 of the Revenue Act of 1918 denied.

*Evert L. Bono, Esq.,* for the petitioner.
*Bruce A. Low, Esq.,* for the respondent.

This proceeding involves the determination by the Commissioner of a deficiency in income and profits taxes for the fiscal year ended

November 30, 1920, of $79,407.60. At the hearing, on motion of the counsel for the respondent, the answer was amended to allege that the net income was understated by $6,260, by reason of the improper allowance of a deduction of that amount, claimed as automobile expense.

### FINDINGS OF FACT.

Petitioner is a Texas corporation, engaged in the wholesale dry-goods business, with its principal office at Dallas. It kept its accounts on the basis of the fiscal year ended November 30, and made its income and profits-tax returns on the basis of such fiscal year. The Commissioner mailed a deficieny letter to the petitioner on April 13, 1925, notifying it of his determination of a deficiency of $79,407.60 in income and profits-tax for the fiscal year ended November 30, 1920. In determining such deficiency, the Commissioner made the following adjustments in the net income reported by the petitioner in its return:

(1) Gross sales increased_____ $25,113.22
(2) Cash discount restored to inventory_____ 14,295.27
(3) Amount paid for cancellation of a lease decreased_ 12,631.68
(4) Insurance deduction decreased_____ 1,514.56
(5) Interest deduction decreased_____ 9,755.73
(6) Bad debts deduction decreased_____ 105,158.17

(1) The increase in gross sales of $25,113.22 as made by the Commissioner represents a charge made by the petitioner against the gross sales of goods which had been shipped to customers, and which petitioner had been notified, previous to November 30, 1920, would be returned. Petitioner made a charge against the gross sales of 50 per cent of the amount of the invoices, which was the estimated profit on the goods which petitioner had been notified would be returned, and which were returned. None of the goods, however, were actually returned until after November 30, 1920. Petitioner did not include these goods in its inventory, but as the profit on same was reflected in the gross sales, a direct charge against the gross sales was made. Petitioner's gross profits, on an average, amounted to about 21 or 22 per cent. Petitioner, in addition to losing the profit on this merchandise, was compelled to pay the freight to and from the point of destination, and suffered the decline in the value of the merchandise which had taken place after it was shipped. The charge of 50 per cent of the amount of the sales price against gross sales was petitioner's estimate of the profits loss, plus freight charges and plus a decline in the value of the merchandise. It had not been petitioner's custom in former years to charge off an anticipated loss of profit on returned goods. All goods returned prior to the close of the fiscal year were included in the inventory.

(2) The disallowance of cash discount of $14,295.27 represented the difference between the amount of cash discount deducted from the inventory at the beginning of the year, and the amount of cash discount deducted from the inventory at the end of the year, in the amounts of $19,525.56 and $33,820.83, respectively. Since 1914, when petitioner started business, it had been its practice to take advantage of discounts allowed for cash by those who sold it merchandise. It had continuously been its custom to take inventory of its merchandise on the basis of cost or market value, whichever was lower, which included the cash discount which was allowed or would have been allowed by making the purchase at the price at which the goods were inventoried, and then to deduct the average cash discount allowed by manufacturers. Petitioner followed this policy in determining its inventory for income-tax return purposes. On December 1, 1919 (the beginning of the fiscal year under consideration), it deducted $19,525.56 from its total inventory and deducted $33,820.83 at the end of said fiscal year. Commissioner contends that these amounts should be restored to inventory and has increased the net income by the difference between the amount deducted from inventory at the close of the year and the amount deducted from inventory at the beginning of the year.

(3) The Miller Manufacturing Co. in 1916 leased a part of petitioner's building for a period of 10 years. In 1919, the business of the petitioner had increased to such an extent that it was necessary for it to secure possession of this portion of the building. In order to secure such possession, it paid the Miller Manufacturing Co. $15,000 for the cancellation of this lease and deducted this expenditure from income. This expenditure was made to secure the possession of a building which petitioner owned, and for the cancellation of the lease on a building which was owned by petitioner. The Commissioner held that the $15,000 bonus paid for the cancellation of the lease should be prorated over the entire period during which the lease would have been in force had it not been canceled. He allowed $2,368.32 as a deduction for the year 1920. He disallowed $12,631.68 as a deduction for that year and increased net income accordingly.

(4) The amount of $1,514.56 insurance disallowed as a deduction from income, represents the difference between the prepaid insurance on November 30, 1919, and on November 30, 1920. It was the policy of petitioner to charge to expense the amount expended for insurance in the year in which such expenditure was incurred. It set up on its books at the end of the year the amount of unexpired insurance, but always treated the amount paid for insurance as an expense in the year in which the expenditure was made.

(5) Petitioner borrowed considerable sums of money during the fiscal year under consideration, and paid substantial amounts of interest. In its return for the fiscal year ending November 30, 1920, petitioner claimed a deduction for interest in the amount of $175,-195.95. The Commissioner disallowed $9,755.73 of this amount. The amount paid during the year was $165,867.96.

(6) About August, 1920, the merchandise handled by the petitioner began to decline in value, there being a decline of from 30 to 40 per cent from the beginning of 1920 to the end of that year. Serious financial depression had settled over the entire country and particularly over the cotton-growing States of Texas, Oklahoma, Louisiana, and Arkansas, which was the territory in which petitioner sold most of its goods. The price of cotton had dropped from 43.75 cents per pound in July to 15.48 cents per pound in November, 1920. Finding itself with a large inventory of goods which were rapidly decreasing in value, and preferring to take credit risks rather than to be forced to continue with its inventory, the petitioner sold its goods without much regard for the credit of the purchaser. Because of business conditions and the consequent inability to collect accounts, many of the petitioner's customers became unable to pay their accounts, customers became insolvent or bankrupt, and many returned merchandise because they were unable to pay for it. During the period of business depression, and prior to November 30, 1920, the petitioner's credit man formed the opinion that certain accounts were uncollectible in whole or in part and advised petitioner to charge them off on its books. The petitioner in its return claimed as a deduction for bad debts $245,169.47. The Commissioner refused to allow $105,158.17 of this amount. In the petition it is alleged that the whole amount should have been allowed. At the hearing the petition was amended to allege that debts in the amount of $95,148.43 should have been allowed as deductions in addition to those which were allowed.

On November 30, 1920, the balance due and owing to the petitioner from Barnes and Hambuck Co., Lone Oak, Tex., was $7,578.82. On October 15, 1920, a check for $1,500 had been received from the debtor, which was subsequently returned unpaid and charged to the account. On October 28, 1920, a check for $500 had been received. On November 19, 1920, a shipment was made to this customer amounting to $705.21. The credit manager of the petitioner directed that the account be charged off as worthless and an entry was made on the accounts, as of November 30, 1920, charging the entire balance of the account as of that date to an account known as "reserve for losses." A man sent to investigate into the affairs of the debtor re-

ported that that company was "broke." No collections were subsequently made.

On November 30, 1920, the balance due and owing to the petitioner from Hancock & Company, Haskell, Tex., was $10,019.53. On the basis of a credit report that the company was insolvent, the credit manager of the petitioner directed that the account be charged off as worthless and an entry was made on the accounts as of November 30, 1920, charging the entire balance to the account known as reserve for losses. Collections of $1,887 and $1,138.38 were made on December 1 and December 23, 1921, respectively, and during December, 1920, credit sales of about $30 were made to this customer.

On November 30, 1920, the balance due and owing to the petitioner from W. A. Nash & Co., Kaufman, Tex., was $12,339.97. The last payment on account had been made on July 1, 1920. On November 20, 1920, the petitioner had sold to this company on credit goods invoiced at $70. The petitioner sent an investigator to go over the affairs of this company, who reported that it had large assets and heavy liabilities. The debtor did a large credit business and had many accounts receivable which were worthless due to the condition of the cotton market. The credit manager of the petitioner directed that the account be charged off as worthless and an entry was made on the accounts as of November 30, 1920, charging the entire balance to the account known as reserve for losses. No collections were subsequently made.

On November 30, 1920, the balance due and owing to the petitioner from Key & Co., Anson, Tex., was $7,350.26. The petitioner had received two payments of $1,000 each on this account on October 28, 1920, and November 30, 1920. On November 27, 1920, the petitioner had sold a bill of goods of approximately $58 to this customer. The credit manager of the petitioner directed that the account be charged off as worthless and an entry was made on the accounts, as of November 30, 1920, charging the entire balance to the account known as reserve for losses. On December 15, 1920, a payment of $1,000 was received. Goods valued at approximately $700 were also returned and credited after November 30, 1920. Prior to November 30, 1920, the petitioner had a credit report on Key & Co.

On November 30, 1920, the balance due and owing to the petitioner from Matthews & Searls, Athens, Tex., was $7,444.26. There had been a payment of $1,000 on account on November 12, 1920. The credit manager of the petitioner directed that the account be charged off as worthless and an entry was made on the accounts as of November 30, 1920, charging the entire balance to the account known as reserve for losses.

Collections were subsequently made on the account as follows:

| | |
|---|---:|
| December 16, 1920 | $1,000 |
| December 24, 1920 | 500 |
| December 30, 1920 | 500 |
| January 7, 1921 | 1,000 |
| January 21, 1921 | 500 |

On December 13, 1920, the petitioner sold to this customer on credit goods invoiced at $12.73.

On November 30, 1920, the balance due and owing to the petitioner from Anderson, Hays, and Gray, Paris, Tex., was $9,932.04. On that date the petitioner received a cash payment of $1,122.20. The credit manager of the petitioner directed that the balance of the account be charged off as worthless, and an entry was made on the accounts as of November 30, 1920, charging such balance to the account known as reserve for losses. The petitioner on December 7, 1920, sold goods to this customer on credit, invoiced at $90. No collections were subsequently made.

On November 30, 1920, the balance due and owing to the petitioner from Pecos Dry Goods Co., Pecos, Tex., was $13,990.80. The credit manager of the petitioner believed this account to be uncollectible and an entry was made on the account as of November 30, 1920, charging the balance to the account known as reserve for losses. The store of this customer was then open and doing business. Collections were subsequently made as follows:

| | |
|---|---:|
| December 16, 1920 | $1,000 |
| December 30, 1920 | 1,000 |
| January 14, 1921 | 1,000 |

On December 18, 1920, goods invoiced at approximately $40 were sold to this customer on credit.

On November 30, 1920, the balance due and owing to the petitioner from James & Reighard, Quanah, Tex., was $2,582.95. The last sale to this customer had been made on September 28, 1920, and on November 5, 1920, a cash payment of $150 had been received. The credit manager of the petitioner believed that the balance of the account was uncollectible and directed that it be charged off as worthless. An entry was made on the accounts as of November 30, 1920, charging such balance to the account known as reserve for losses. No collections were subsequently made.

On November 30, 1920, the balance due and owing the petitioner from Cunningham, Westbrook Co., Deport, Tex., was $13,051.93. The last sale made on this account was March 17, 1919. As of November 30, 1920, there was charged from this account to the account known as reserve for losses, $13,057.91. Subsequently, on December 20, 1920, two checks of $1,000 each were received which

11340°—28——39

were returned unpaid and charged back to the account together with protest fees of $6.

On September 2, 1920, the balance due and owing the petitioner from E. F. Grissom, Desdemona, Tex., was $977.52. Grissom became bankrupt July 6, 1920. As of September 2, 1920, there was transferred from this account to the account known as reserve for losses, $971.42, leaving a balance of $6.10. No collections were thereafter made.

On October 19, 1920, the balance due and owing to the petitioner from Sanders Endsley Co., Texarkana, Tex., was $5,544.15. This company had become bankrupt early in the year. On October 19, 1920, there was transferred from this account to the account known as reserve for losses, $3,500. On November 27, 1920, a dividend of $1,128.83 was received from the bankrupt estate. As of November 30, 1920, there was transferred from this account to the account known as reserve for losses, $644.15, leaving a balance in the account of $271.17.

On October 19, 1920, there was due and owing to the petitioner from T. C. Owens, Payner, Tex., $2,568.96. This customer had failed, and under date of October 19, 1920, there was transferred from this account to the account known as reserve for losses, $1,500. As of November 30, 1920, there was further transferred from this account to the account known as reserve for losses, $768.96, leaving a balance in this account of $300. Subsequently, in 1921 or 1922 a final dividend of $376 was received on account.

On October 19, 1920, the balance due and owing to the petitioner from W. C. Powell and Son, Queen City, Tex., was $4,104.24. On that date there was transferred from this account to the account known as reserve for losses, $3,000, leaving a balance of $1,104.24. The debtor was in bankruptcy prior to that date and thereafter the following dividends were received:

| | |
|---|---|
| December 3, 1920 | $187.00 |
| December 28, 1920 | 100.29 |

On October 19, 1920, the balance due and owing to the petitioner from McDavid Brothers, Overton, Tex., was $6,159.59. On that date there was transferred from that account to the account known as reserve for losses, $4,000, and as of November 30, 1920, there was transferred from that account to the account known as reserve for losses, $1,859.59, leaving a balance in the account of this customer of $300. On January 22, 1921, $615.96 was recovered on this account.

On October 19, 1920, the balance due and owing to the petitioner from Economy Store, Beaumont, Tex., was $2,487.45. On that date there was transferred from this account to the account known as reserve for losses, $1,500. On November 3, 1920, a dividend of

$134.33 was received. The credit manager of the petitioner directed that the balance of the account be charged off as worthless and an entry was made on the accounts as of November 30, 1920, charging the balance of $853.12 to the account known as reserve for losses.

On November 30, 1920, the balance due and owing to the petitioner from A. J. Pass, Aubrey, Tex., was $445.82. The debtor was in bankruptcy. As of November 30, 1920, an entry was made on the account charging $420.82 to the account known as reserve for losses, leaving a balance of $25.

On November 30, 1920, the balance due and owing to the petitioner from Wagoner & Co., Maybank, Tex., was $424.05. This company was insolvent. Pursuant to the instructions of the credit manager of the petitioner, $414.05 of this amount was transferred to the account known as reserve for losses as of November 30, 1920, leaving a balance not charged off of $10. Thirty-four dollars and ninety-one cents was later recovered on this account.

On November 30, 1920, the balance due and owing to the petitioner from C. E. Gray, Chireno, Tex., was $2,454.59. The petitioner had information that the debtor had become bankrupt in October, 1920. As of November 30, 1920, there was transferred from this account to the account known as reserve for losses, $2,254.59, leaving a balance in the account of $200. A dividend of $369.79 was received December 7, 1920.

On November 30, 1920, the balance due and owing to the petitioner from Strong & Strong, Henderson, Tex., was $2,056.76. The petitioner had information that the debtor was in bankruptcy prior to that date. As of November 30, 1920, there was transferred from this account to the account known as reserve for losses, $1,556.76, leaving a balance of $500 in the account. A dividend of $210.45 was received on December 23, 1920, a further dividend of $210.45 was received on April 10, 1921, and subsequently, a final dividend of approximately $100 was received, making the total collection on the account approximately $520.

On November 30, 1920, the balance due and owing to the petitioner from J. H. Thompson, Lone Oak, Tex., was $1,197.04. As of that date there was transferred from this account to the account known as reserve for losses, $879.04, leaving a balance in the amount of $300. Dividends were subsequently received as follows:

| | |
|---|---:|
| April 9, 1921 | $247.21 |
| September 16, 1921 | 25.00 |
| May 1, 1922, final dividend | 6.18 |

On November 30, 1920, Yarborough Company, Inc., Powhattan, La., was indebted to the petitioner in the amount of $200, representing a check for that amount received by the petitioner on October 2,

1920, and returned unpaid on October 29, 1920. The account was charged off on November 30, 1920, as worthless.

On November 30, 1920, the balance due and owing from M. Vasquez, Somerton, Ariz., was $439.69. The last sales on credit on this account had been made in March and April, 1920, and the last credits to the account were made in September, 1920. The credit manager of the petitioner believed the account to be worthless before November 30, 1920, and pursuant to his instructions it was charged off in that year.

In 1918 the petitioner shipped goods invoiced at $269.44 to Gardner & Coggins, Hollis, Okla. The purchaser claimed that such goods had never been delivered. The merchandise could not be located, and in July, 1920, the petitioner credited the account of this customer with the amount charged for the goods so shipped and claimed the amount so credited as a deduction for debts ascertained to be worthless in its 1920 tax return.

(7) The sales of the petitioner during the fiscal year were $10,721,426.79. Its purchases were $9,859,115.85. Notes payable at the beginning of the year were $936,701.01 and at the end of the year were $2,177,200. All notes were endorsed by the stockholders. Such borrowed money was necessary to the conduct of the volume of business done by the petitioner in the taxable year. The statutory invested capital, as determined by the Commissioner and accepted by the petitioner, was $2,656,613.68. The average borrowed capital of the petitioner, computed as of the last day of each month, was $2,189,025.25. Accounts receivable at the end of the year were $2,489,526.37. The profits tax determined by the Commissioner was $90,887.90 upon a net income of $602,295.67.

The Perkins Dry Goods Co. was a competitor of the petitioner, engaged during the taxable year in the wholesale drygoods business in Dallas, and sold goods chiefly in Texas, Oklahoma and Arkansas. Its net sales (gross sales less returned goods) were $9,975,966.25. It paid no excess-profits tax.

OPINION.

PHILLIPS: (1) The facts with respect to the first issue are found as pleaded in the petition and admitted in the answer, with some additional facts established by testimony. It appears that prior to the close of the taxable year petitioner had been notified that goods which it had sold for $50,226.44 and had shipped to customers would be returned. None of the goods were in fact returned prior to the close of the taxable year. The petitioner's officers estimated that the average gross profit on such goods was 21 or 22 per cent out of the sales price, that the market value was less than 80 per cent of the

cost, and that, with freight and handling charges added, there would be a loss of 50 per cent of the sales price and sought to charge this off as a deduction from gross income for the year. No such deduction is allowed by the law, but it is urged by counsel that the practical effect is to reduce gross sales by the amount which petitioner was notified would be returned and to include the goods in the inventory at their market value. Even so, the deduction sought included expenses for freight, handling and overhead which were neither paid nor incurred in the taxable year and which would be properly considered in computing income of the following year.

But we can not agree with the contention that because petitioner had been notified that certain goods would be returned it could treat those goods as its own, in the same manner as if they had been returned and their return accepted. The goods had been sold and title had passed from the petitioner. It was entitled to the purchase price and was not required to accept the return of the goods. Certainly until it agreed to accept their return, there had been no reduction in the amount of goods sold, no decrease in the amount which it was entitled to demand from the purchasers and no revesting of title to the goods sold so that it was justified in including such goods in its inventory as its property. Mere notice that the goods would be returned would have no effect on either the liability of the purchaser to pay or title to the goods. A different situation might result if the petitioner had agreed to accept the return of the goods and the necessary steps to revest title to the goods in it had been taken. As to this we express no opinion. Here there is no proof that petitioner agreed to accept the return of the goods or that such goods had again become the property of the petitioner. The substance of the situation is that at the close of the year the petitioner anticipated that it would be forced to accept the return of certain goods, from which it would suffer a loss. It estimated the anticipated loss and claimed a deduction of the estimated amount. The tax law provides for the deduction of losses when sustained and makes no provision for the deduction of such an anticipated loss. Any loss occurred at the time when the petitioner no longer had a legal right to recover the purchase price and in place of such right, was revested with the property. The action of the Commissioner with respect to this item is approved.

(2) Petitioner, in making out its income-tax returns, consistently followed the practice of taking inventory on the basis of cost or market value, whichever was lower, without regard to cash discounts, and deducting therefrom the average discount allowed by manufacturers for cash. It had followed this method consistently since 1914 and contends that great consideration should be given to the consist-

ency of its practice. Section 203 of the Revenue Act of 1918 provides that inventories shall be taken on such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming to the best accounting practice in the trade or business.

Article 1583 of Regulations 45, relating to taxes under the Revenue Act of 1918, provides:

Cost means: (1) In the case of merchandise purchased, the invoice price less trade or other discounts, except strictly cash discounts, approximating a fair interest rate, which may be deducted or not at the option of the taxpayer, *provided a consistent course is followed.* (Italics ours.)

The effect of the petitioner's method of inventory is to take the cash discount as a deduction in the year in which the goods are sold. The adjustment made by the respondent allows the deduction in the year in which the payment is made. From a purely legalistic point of view it might be pertinent to determine whether such a cash discount is income arising from the use of money or is a reduction in the cost of the goods purchased. It seems to us, however, unnecessary to delve into such a refinement. Under either computation there is no double deduction and over a period of years the effect of either basis on net income would be the same. The regulations promulgated by the Commissioner pursuant to statutory authority permit either basis, if consistently followed. In the *Appeal of Thomas Shoe Co.*, 1 B. T. A. 124, the Board pointed out the desirable features of a consistent basis for inventories. It appears that the petitioner has followed this basis since its organization and we are, therefore, of the opinion that the Commissioner erred in this adjustment.

(3) During the taxable year the petitioner paid $15,000 for the cancellation of a lease which it had previously executed upon property which it owned, which lease still had several years before expiration. It claimed this amount as a deduction. The Commissioner held that the amount paid should be amortized over the period of the lease which remained unexpired at the time the cancellation took place and allowed $2,368.32 as a deduction. In this we believe the Commissioner erred.

We have no doubt that such an expenditure made for the purpose of securing possession of the property for use in the business is an ordinary and necessary expense, nor do we understand that respondent contends the contrary. Such expenses are to be deducted when paid or incurred. Here the expense was both paid and incurred in the taxable year. Unless the petitioner acquired a capital asset with a life extending beyond the taxable year (in which event the cost of the asset is to be exhausted over its life), the expenditure is deductible.

The petitioner owned the fee of the building. It had given the lease and wished to terminate it. The cancellation of the lease did no more than give to the petitioner the possession of the property which it had leased. It created no greater title than it had previously owned. It created no new estate and no asset value which is exhaustible. This situation is to be distinguished from those where a fee is purchased subject to a lease and the lease subsequently purchased, or where payment is made to secure a lease of property owned by another. Here the payment served only to secure to petitioner what it previously had, namely, possession of its property.

(4) With respect to the adjustment made for insurance, it is our opinion that the action of the Commissioner was correct. The payment in advance of premiums for insurance results in the creation of an asset, since the policy has a surrender value. The asset value is exhausted ratably over the term for which the premium is paid. In the balance sheet such items are often carried as assets under such terms as prepaid insurance, or prepaid expense. It appears that such was the basis on which the petitioner kept its accounts. The adjustment made by the Commissioner appears to be in accordance with the method of accounting employed by the petitioner and appears further to be such that petitioner's net income is more nearly correctly reflected than on the basis used in the return. The adjustment made by the Commissioner with respect to this item is approved.

(5) Our sole information with respect to the interest deduction is that $165,867.96 was paid during the taxable year, that $175,195.95 was deducted on the return, and that the Commissioner disallowed $9,755.73 of this amount. It is the contention of the petitioner that $175,195.95 was paid during the taxable year, that the amount allowed by the Commissioner was the amount which accrued, that its accounts were kept in such a manner that it consistently deducted interest paid and not interest accrued. None of these allegations are supported by proof.

Interest accrues ratably over the period of the loan and where, as here, the books of the petitioner are kept on a basis other than cash received and disbursed, the law provides that interest is allowable as a deduction as it accrues. The petitioner can not be sustained in its contention that it may deduct interest as it pays it. The action of the Commissioner must be approved.

In passing, it may be noted that while the petitioner claimed that interest paid amounted to $175,195.95, and deducted this amount on its return, the only evidence submitted is that the interest paid was $165,867.96, which is approximately the amount allowed by the Commissioner. The difference between the amount claimed on the return and the testimony as to the amount paid is unexplained.

(6) In its return the petitioner claimed deductions for a number of debts alleged to have been ascertained to be worthless and charged off within the taxable year. The Commissioner allowed some and disallowed others. The petitioner alleges error as to some 23 of those disallowed and issue was joined between the parties by the answer of the Commissioner denying that the amount of debt disallowed was ascertained to be worthless and charged off within the taxable year.

We are satisfied that such debts existed and that prior to the close of the taxable year the credit manager of the petitioner directed that they be charged off in whole or in part, as found in our findings of fact.

Whether the entry was made on the books of account on November 30, 1920, is not clear. It does appear that the entries were made in the usual course with the other closing entries as of November 30, 1920, and before the books were finally closed. These circumstances are, in our opinion, sufficient to meet the requirements of the statute with respect to the charge-off.

We come then to the principal question involved. The statute provides specifically for the deduction of " debts ascertained to be worthless and charged off within the taxable year." As previous decisions have pointed out, it is not worthlessness which controls, but ascertainment of worthlessness. Since a debt may become worthless in one year, but may be ascertained to be worthless in a different year, and since it seems certain that Congress had no intention that the deduction of the same debt should be twice allowed, it becomes incumbent upon the taxpayer whose claimed deduction is disallowed by the Commissioner, to establish that he did ascertain the debt to be worthless in the taxable year in which he claims it to be deductible.

The word " ascertain " is defined in Bouvier's Law Dictionary as:

To make certain by examination; to find out. The word *ascertain* is held to have two meanings: (1) known; (2) made certain.

Substantially the same definition is given in Webster's New International Dictionary. The word " worthless " is defined in the latter work as:

Destitute of worth; having no value; valueless; useless.

The burden then is upon the petitioner to establish that it did make certain during the taxable year that the debts claimed as deductions were without value. We take it for granted that when Congress authorizes this Board to decide the issues arising between a taxpayer and the Commissioner in such a case as this, such taxpayer has not established the correctness of his contention by his bald statement that he believed it to be worthless, or that he ascertained

it to be worthless or that, on undisclosed information he came to the conclusion that it was worthless. To so hold would be to put the Government in the hands of the taxpayer and substitute his judgment as to the conclusion to be drawn from the facts for that of the body created to decide the issue.

Nor is it a question whether the taxpayer believed the debt to be worthless. To so hold would be to grant an undue advantage to the pessimist or to the taxpayer who made no investigation. In our opinion the burden upon the petitioner is to show what steps he took to collect the debt, what information came to his knowledge and what other circumstances existed which led him to his conclusion. It then becomes the duty of the Board to determine whether the debt was in fact ascertained to be worthless within the meaning of the law. *Appeal of Alemite Die Casting & Manufacturing Co.*, 1 B. T. A. 548.

Aside from the testimony as to general financial conditions in the latter part of 1920, the sole testimony in the instant case with respect to the ascertainment of worthlessness is that of the credit manager of the petitioner. As to most of such debts, he testified that he believed them to be bad and that petitioner was justified in charging them off. As to some of them he testified that he acted on the basis of credit reports, but could not either produce such reports or state what facts they disclosed. When asked the basis on which he directed debts charged off, he testified:

It was our policy to write off immediately what we would consider to be a loss, but it was always merely an estimate.

It was always our policy not to carry on our books any assets we did not think were worth the amount that they were carried at.

While the Revenue Act of 1921 and subsequent Acts allow part of a bad debt to be charged off and permit reserves to be set up for bad debts, the Board has held that this was not true under the Revenue Act of 1918 and prior Acts. *Appeal of Steele Cotton Mill Co.*, 1 B. T. A. 299. However advisable it may be from a business standpoint to charge off portions of debts regarded as collectible only in part, or to set up a reserve for the amount estimated to be uncollectible, Congress permitted the deduction under the 1918 Act only when the debt was ascertained to be worthless; not when it was of doubtful value, but when it was of no value.

The petitioner has shown the deplorable conditions in which business found itself in the latter part of 1920 in the States in which petitioner sold its goods. In such circumstances as are shown to have existed, it may be conceded that less specific information with reference to the financial condition of each of its debtors might be required in determining worthlessness than might seem necessary under normal conditions. In the light of these general principles

we consider that the following debts were ascertained to be worthless in the taxable year:

| | | | |
|---|---|---|---|
| Barnes & Hambuck Co | $7,578.82 | Economy Store | $2,353.12 |
| W. A. Nash & Co | 12,339.97 | A. J. Pass | 420.82 |
| E. F. Grissom | 971.42 | C. E. Gray | 2,254.59 |
| Sanders, Endsley Co | 4,144.15 | Yarborough Co., Inc | 200.00 |
| T. C. Owens | 2,268.96 | | |

In the case of Hancock & Co. the report was that the company was insolvent. This means no more than that the account was probably uncollectible in part. Even an insolvent debtor may pay a substantial part of his indebtedness, as was done here.

The payments on account by Key & Co. on October 28, November 30, and December 15, all negative the conclusion that this account was worthless as does the shipment of goods on November 27, although small in amount. With no further testimony as to the information in the possession of the petitioner regarding this indebtedness, the deduction can not be allowed.

It does not appear what information, if any, petitioner had which justified it in charging off the account of Matthews & Searles. Events within the next month developed that the information was not accurate if it reported the account as uncollectible. The deduction claimed can not be allowed on the record as made before us.

Likewise we have no basis for determining whether the petitioner did in fact ascertain the account of Anderson, Hays & Gray to be worthless on November 30, 1920. A substantial payment was received on that day and without some showing of further facts, the charge-off has not been justified. Furthermore, there was thereafter a credit sale, small in amount it is true, but one does not ordinarily sell goods to another on credit if it is certain that payment never will be received. A subsequent sale on credit is consistent with the thought that collection may be doubtful but surely in the business world in the absence of some unusual situation, can not be consistent with the statement that collection never will be made.

The observations which we have made in the two preceding paragraphs apply with equal force to the account of Pecos Dry Goods Co.

The deduction claimed on the account of James & Reighard must be disallowed for lack of evidence. The same is true of the accounts of Cunningham, Westbrook Co., McDavid Brothers, Wagoner & Co., J. H. Thompson, and M. Vasquez.

The Board has held that where the debtor is in bankruptcy, and it is apparent that the amount ultimately recovered will be comparatively small, the creditor is justified in charging off the debt, without waiting until the affairs of the bankrupt are settled. *Appeals of Egan & Hausman Co., Inc.*, 1 B. T. A. 556, and *Pacific Pipe &*

*Supply Co.*, 2 B. T. A. 870. While there is no testimony directly to the point, it would appear from the amounts charged off and from subsequent collections where partial write-offs were made, that the petitioner had fairly accurate information as to the condition of the bankrupt estates. We believe the evidence sufficient to allow the deduction of the amounts written off the accounts of the bankrupt debtors, except in the cases of Strong & Strong, and W. C. Powell & Son, where the amounts not charged off were substantial, indicating that petitioner expected to receive substantial dividends.

It appears that as to some of the debts a portion only was charged off. While this may have a bearing upon the question whether there had been an ascertainment of worthlessness, it has been held that where there was such ascertainment, but only a partial charge-off, the amount charged off may be allowed as a deduction without doing violence to the statute. *Appeal of Mason Machine Works Co.*, 3 B. T. A. 745. We follow the principle laid down in that decision. It is further to be noted that the petitioner claims only the amounts charged off in the taxable year.

There remains the amount credited to Gardner & Coggins in 1920 for goods shipped to them in 1918, which they claimed never to have received. So far as the evidence before us is concerned, no more reason existed for claiming the item as a deduction in 1920, than existed in 1918 or 1919. So far as we are informed, nothing happened in 1920 except a credit on the books and no reason has been shown why the amount should be allowed either as a debt ascertained to be worthless or a loss sustained in the year before us.

To summarize, we are of the opinion that the proof is insufficient to establish that the following debts were ascertained to be worthless:

| | | | |
|---|---|---|---|
| Hancock & Co | $10,019.53 | McDavid Bros | $5,859.59 |
| Key & Co | 7,350.26 | Wagoner & Co | 414.05 |
| Matthews & Searls | 7,444.26 | J. H. Thompson | 897.04 |
| Anderson, Hay & Gray | 8,809.84 | M. Vasquez | 439.69 |
| Pecos Dry Goods Co | 13,990.80 | Strong & Strong | 1,556.76 |
| James & Reighard | 2,582.95 | W. C. Powell & Sons | 3,183.00 |
| Cunningham, Westbrook Co | 13,057.91 | Gardner & Coggins | 269.44 |

(7) Petitioner claims that it falls within section 327 of the Revenue Act of 1918 and is entitled to have its tax computed by a comparison with the tax paid by representative concerns, as provided in section 328. Its argument is based primarily upon the amount of borrowed money used. It appears that during the year its invested capital was $2,656,613.61 and its average borrowed capital $2,189,025.25; in other words, 40 per cent of its operating capital was borrowed. In many businesses this would not be regarded as unusual

or abnormal and in the absence of any evidence that it is abnormal in the wholesale dry goods business, there is nothing on which we may base an opinion as to normality or abnormality.

(8) A revenue agent who audited the return of the petitioner for the taxable year and examined its books, increased the net income by $6,260 as automobile expense disallowed. In the deficiency notice it was conceded that this adjustment was erroneous. At the hearing the answer of the respondent was amended to allege that net income as determined by the Commissioner should be increased by this item of $6,260. As to such issue, the burden of proof is upon the respondent. It was the contention of his counsel that three new automobile trucks were purchased during the taxable year, that two were traded in exchange and that the net amount paid was deducted in computing the net income. The evidence is most indefinite and unsatisfactory; so much so that we have not felt warranted in making any findings of fact upon this issue. Should it be that the evidence is sufficient to show the purchase of such trucks, there is nothing from which we may know whether the amount was deducted in computing the net taxable income shown on the petitioner's return. To add this item to net taxable income may be to restore an item which was not allowed as a deduction. In view of the action of the office of the Commissioner in reversing the action taken by the revenue agent, without stating the ground therefor, we should hesitate to again add this amount to net income without the clearest evidence that such action is proper and will not result in a duplication of the same item. The Commissioner has failed to show that such addition to net income should be made.

Reviewed by the Board.

*Decision will be entered on 20 days' notice, under Rule 50.*