Ann Greene v. Commissioner. Charles T. Greene v. Commissioner.
Greene v. Commissioner
Docket Nos. 43256, 43257.
United States Tax Court
T.C. Memo 1954-193; 1954 Tax Ct. Memo LEXIS 52; 13 T.C.M. (CCH) 1036; T.C.M. (RIA) 54299; November 17, 1954, Filed Robert R. Blasi, Esq., for the petitioners. Thomas C. Cravens, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in the petitioners' income tax as follows: 1946
1947
1948
Ann Greene
$13,619.87
$ 8,992.67
$460.00
Charles T. Greene
23,568.63
20,332.79
705.26
The issues presented by the pleadings are the corectness of the respondent's action (1) in disallowing deductions taken by petitioners for *53 1948 as business bad debts, and (2) in failing to allow an operating loss occurring in 1948 arising from such business bad debts to be carried back to 1946 and 1947. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners are residents of Chicago, Illinois, and filed their individual tax returns for the taxable years in controversy with the collector of internal revenue for the first district of Illinois. Charles T. Greene, hereinafter referred to as petitioner, and Ann Greene are husband and wife. In 1930 the petitioner went into the business of processing fruits and fruit juices as a sole proprietor, trading as Standard Fruit Products Company. Prior to entering this business, petitioner had been a sales representative of various canners and fruit processors in the Chicago area. In 1934 the petitioner discontinued operating as a sole proprietorship. Thereafter the business was conducted by a corporation, the name of which was Standard Fruit Products Company, Incorporated. The corporation continued in business until it was dissolved on June 30, 1943. On the latter date the petitioners and Esther Boyle entered into a partnership which *54 operated under the name of Standard Fruit Processing Company. All the assets of the corporation were transferred to the partnership, subject to the assumption by the partnership of all of the corporation's liabilities. The petitioner owned a 45 per cent interest in the partnership, his wife owned a 40 per cent interest, and Esther Boyle owned the remaining 15 per cent interest. On August 28, 1944, Esther Boyle assigned her 15 per cent interest in the partnership to the petitioner. Thereafter, the petitioner held a 60 per cent interest, and his wife held a 40 per cent interest in the partnership which continued business under the name of Standard Fruit Processing Company, sometimes hereinafter referred to as the partnership. The balance sheet of the partnership as reflected by its books and records as of March 31, 1947, was as follows: ASSETS
Current assets: Cash on hand and in banks
$ 9,639.51
Receivables -
Customers' accounts
$ 24,771.44
Less reserve for bad debts
600.00
$ 24,171.44
Personal loan
3,700.00
27,871.44
Inventories -
Raw materials -
In licensed warehouse -
Pledged as security for bank
loans (Contra)
$146,950.00
On hand - Unpledged
28,735.50
$175,685.50
Work in process
4,522.00
Finished goods
7,731.99
187,939.49
Total current assets
$225,450.44
Fixed assets: Cost
Depreciation
Book Value
Machinery and equipment
$38,067.21
$ 11,100.90
$ 26,966.31
Automobiles
2,330.18
1,356.12
974.06
Furniture and fixtures
1,278.97
166.25
1,112.72
$41,676.36
$ 12,623.27
$ 29,053.09
Leasehold improvements (Cost)
$233,736.28
Less reserve for amortization
17,092.40
$216,643.88
245,696.97
Deferred charges: Unexpired insurance
$ 13,862.27
Prepaid loan expense
1,579.42
15,441.69
$486,589.10
LIABILITIES
Current liabilities: Notes payable -
Bank loans secured by warehouse receipts covering raw
materials (Contra) -
Due April 16, 1947
$ 22,750.00
Due April 28, 1947
37,625.00
Due May 19, 1947
13,000.00
Bank loan - Unsecured - Due April 28, 1947
6,565.73
$ 79,940.73
Accounts payable - Trade
76,835.20
Accruals -
Taxes -
Personal property
$ 1,307.90
Payroll
502.43
Withholding
586.10
Salaries and wages
2,521.55
4,917.98
Total current liabilities
$161,693.91
Long term liabilities: Personal loan from Charles T. Greene
55,768.43
Total liabilities
$217,462.34
PARTNERS' CAPITAL
Balance, June 30, 1946
$173,890.72
Net income for the nine months ended March 31, 1947
55,351.57
Additional investment during year
39,884.47
Total
269,126.76
$486,589.10
*55 In the early part of 1947 the petitioners decided that the partnership should transfer its business and assets to a corporation to be organized. This change in business form was recommended by Maurice Cohn, president of the Liberty National Bank of Chicago, which financed the loans needed in the partnership business. Cohn insisted that the corporation have a capital of at least $100,000. On April 12, 1947, an Illinois corporation was organized under the name of Standard Fruit Processing Company, Inc., hereinafter referred to as the corporation, for the purpose of carrying on a food processing business. The corporation had an authorized capital of $100,000, represented by 5,000 shares of common stock with a par value of $20 per share. Upon organization, the corporation purchased the partnership assets at their book value, less the amount of the partnership's liabilities which it assumed. The terms of purchase provided that the purchase price be paid by the issuance by the corporation of $100,000 par value of its capital stock and the remainder, $169,126.76, be paid in cash by the corporation if and when its profits should be sufficient for that purpose. While the corporation had *56 an authorized capital stock of $100,000, it never issued any stock for the partnership assets or for any other purpose. The portion of the purchase price in excess of $100,000, or $169,126.76, was carried on the books of the corporation as a long-term liability in an account designated "Due to stockholders." The account had no fixed date of payment. No interest was ever paid on it, and no part of the amount thereof was ever paid. So far as disclosed, no note or other instrument was given with respect to the account, and the corporate minute books contain no reference to a liability of $169,126.76 having been incurred at any time by the corporation. The corporation did its regular banking business with the Liberty National Bank of Chicago. From time to time it negotiated commercial loans from the bank to carry on the business. Soon after the organization of the corporation in April 1947, the company applied to the bank for a loan. In order to obtain the loan, the petitioners were required to execute a Subordination Agreement whereby they subordinated their rights respecting the account "Due to stockholders" to any and all rights of the bank arising out of any loans made to the company. *57 The first paragraph of the Subordination Agreement, which was dated June 2, 1947, recited: "You are hereby advised that Standard Fruit Processing Company of Chicago, Illinois, a corporation, is now indebted to the undersigned, Charles T. Greene, in the sum of $101,476.06 and to the undersigned Ann Greene in the sum of $67,650.70. Neither of the undersigned holds any security for the payment of this indebtedness." The amounts recited in the agreement as owing to the petitioners are in the same ratios of the above mentioned $169,126.76 as were their respective interests in the partnership, namely, 60 per cent and 40 per cent. Concurrently with the execution of the Subordination Agreement, petitioner was required by the bank to make an assignment to the bank, as trustee, of his beneficial interest in a trust which held title to the industrial building at 2600 West 19th Street, Chicago, in which the corporation's business was operated. The building which had been occupied by the partnership had been purchased by petitioners and title thereto had been taken by Liberty National Bank of Chicago under a trust agreement, dated March 5, 1945, in which petitioner was named the primary beneficiary. *58 The property was encumbered by a deed of trust running to the Chicago City Bank and Trust Company, dated September 1, 1945, securing a note in the amount of $70,000. The partnership was lessee of the building under a 10-year lease, beginning October 1, 1945, and ending September 30, 1955, at a rental of $1,000 per month. The trustee under the trust agreement of March 5, 1945, merely held title to the building; it did not collect any rents or manage the property. Petitioners managed the property during the existence of the trust and each of them reported on his Federal income tax return one-half of the rental income and deducted one-half of depreciation and expense (taxes and interest) for the years 1946 through 1950. As lessee, the partnership made leasehold improvements costing $233,736.28 as of March 31, 1947, which it amortized over a period of 20 years. In assuming all of the partnership liabilities, the corporation also assumed the lease the partnership had on the building. The corporation's books and records reflect additional improvements made by it to the building in 1947 and 1948. The corporation amortized over a 20-year period the leasehold improvements made by it and took *59 deductions therefor on its income tax returns until the building was sold in 1950. Neither petitioner, as an individual, ever made any of such improvements. In 1947 the corporation purchased at a cost of approximately $140,000 approximately one million pounds of fresh cherries for processing into maraschino cherries. After the cherries were bought from the growers, they were put through a preliminary process known as "brining." The cherries were brined in a warehouse at Donald, Washington, by an employee of the corporation named Kirk Fredericks. Fredericks was a trusted and key employee of the corporation who had the required knowledge of chemistry and fruit technology necessary to carry out the brining process. He became personally interested in a tomato packing business and delegated his duties as an employee of the corporation to a man who knew little or nothing about the brining process, with the result that the entire stock of cherries bought for processing in 1948 was either partially or totally destroyed. The infidelity of Fredericks resulted in a loss to the corporation of approximately 3,700 barrels of brined cherries with an approximate value of $125,000. The damage to *60 the fruit was first discovered when the inital shipments of cherries were received at the Chicago finishing plant. Instead of being firm and plump, the cherries were in a soft and deteriorated condition which made them unsuitable and would have caused them to disintegrate if subjected to further processing. Current orders were filled from hold-over stocks on hand from previous years and all remaining unfilled orders were immediately cancelled. Except for some salvaged cherries that were sold to another cherry processor in Chicago, the entire mass of spoiled cherries was dumped to save storage charges. In an effort to keep the business going, an attempt was made to purchase brined cherries on the open market or from competitors. This met with little success. As a last resort, the corporation attempted to shift its operation to the processing and packaging of other food products, such as olives and mayonnaise dressing, but this did not prove successful. The corporation ceased active operation in the latter part of the calendar year 1948. It subleased the building it was occupying and received a rental of $12,760 for the fiscal year ended June 30, 1949, and $12,441.52 for the fiscal *61 year ended June 30, 1950. The corporation commenced liquidation in 1949 by selling some of its machinery and equipment. During that year it paid salaries to both petitioners and also purchased an automobile. On March 1, 1950, the property occupied by the corporation was sold. In reporting the sale of the land, building and leasehold improvements, the petitioners and the corporation prorated the sales price according to the adjusted basis of the respective assets they each owned and each party reported a capital loss on the sale. The balance sheet of the corporation as reflected by its books and records as of December 31, 1948, was as follows: ASSETS
Current assets: Cash on hand and in banks
$ 478.50
Accounts and loans receivable
$ 3,739.54
Less - Reserve for bad debts
600.00
3,139.54
Inventories
12,905.00
Total current assets
$ 16,523.04
Fixed assets: Machinery and equipment
$ 70,364.69
Leasehold improvements
262,896.74
Less - Reserve for depreciation
62,591.11
270,670.32
Deferred charges: Unexpired insurance
$ 13,463.95
Prepaid loan expense
1,344.43
14,808.38
$302,001.74
LIABILITIES
Current liabilities: Notes and accounts payable -
Notes
$ 15,400.00
Accounts
93,470.00
$108,870.00
Accrued liabilities -
Taxes
$ 1,522.73
Salaries and wages
5,443.83
6,966.56
Total current liabilities
$115,836.56
Long-term liabilities: Personal loans from Chas. T. Greene
$ 52,644.36
Due to stockholders
169,126.76
221,771.12
$337,607.68
NET WORTH
Capital stock
$100,000.00
Surplus (Deficit) -
Balance, June 30, 1948
($106,467.20)
Loss for the six months ended Decem-
ber 31, 1948
(29,138.74)
135,605.94
35,605.94
$302,001.74
*62 In his individual Federal income tax return for 1948, the petitioner claimed a deduction in the amount of $155,407.09 for a loss on funds advanced to Standard Fruit Processing Company. The respondent disallowed the deduction in its entirety. On her individual Federal income tax return for 1948, Ann Greene claimed a deduction in the amount of $66,364.03 for a loss of funds advanced to Standard Fruit Processing Company. The respondent also disallowed this deduction in its entirety. Opinion In April 1947 the petitioners organized a corporation to take over the assets and business of a partnership in which they were the sole partners. The corporation purchased the partnership assets for $269,126.76, payable $100,000 in stock of the corporation and the remainder, $169,126.76, in cash if and when the corporation's profits should be sufficient for that purpose. No stock was ever issued by the corporation, and on its books the $169,126.76 was recorded in an account designated "Due to stockholders." No payment was ever made on the account. The petitioners contend that the transaction created a debtor-creditor relationship between them and the corporation became indebted to them in *63 the amount of $169,126.76; that the debt of $169,126.76 became worthless and uncollectible in 1948 and, therefore, is deductible under the provisions of section 23(k)(1) of the Internal Revenue Code of 1939. [1] Alternatively, the petitioners contend that they are entitled to deduct the amount as a loss sustained in a trade or business under section 23(e)(1). [2] Although petitioners' briefs and the pleadings are not clear on the point, we assume their position to be that the $169,126.76 open account "Due to stockholders" represents a debt characterized variously as an advance to the corporation or the deferred payment of purchase price money on the sale of partnership assets. They further contend that this debt resulted in an operating loss which may be carried back to 1946 and 1947. *64 Respondent contends that no debt was created in the transaction and that the $169,126.76 was a contribution to the capital of the corporation. Further, respondent contends that if the Court should find a debt was created, then it was a non-business bad debt. [2] Lastly, respondent contends that the burden of proof was on the petitioners to establish that the debt was worthless on December 31, 1948, if it was a nonbusiness bad debt, or, if it was a business bad debt, they must show the extent or partial worthlessness, and since they have failed to sustain this burden no amount is deductible. We will consider first the issue of whether or not the alleged debt was worthless on December 31, 1948. The record is lacking in evidence as to the market value on December 31, 1948, of the assets shown on the corporation's balance sheet as of that date, or what amount reasonably could have been expected to have been realized on their liquidation. The balance sheet, which was stipulated by the parties, shows liabilities in excess of assets in the amount of $35,605.94 on December 31, 1948. This fact alone does not establish the worthlessness of a debt. Higginbotham-Bailey-Logan Co., 8 B.T.A. 566, 580. *65 The balance sheet shows that the corporation had current assets totaling $16,523.04, machinery and equipment of $70,364.69, other assets of $14,808.38, and leasehold improvements of $262,896.74, or total assets after depreciation of $302,001.74. In the absence of evidence on the matter, we are unable to determine what relationship these book values bore to market values. So far as shown, they well might have been market values on December 31, 1948. The petitioners argue on brief that the leasehold improvements on the corporate balance sheet were of no value to the corporation. This position disregards events indicating otherwise which subsequently transpired. First, the lease was not cancelled on December 31, 1948, as the corporation, which had to pay a rent of $12,000 a year, subleased the building and improvements for a rental at the rate of approximately $13,000 a year in the fiscal years ended June 30, 1949 and June 30, 1950. Therefore, it would appear that the improvements had value to the corporation on December 31, 1948. Secondly, the lease still had five years to run when the building was sold in 1950, and it is unlikely that a lessee would relinquish its rights in improvements *66 in which it had invested over $250,000 and from which it was receiving a net profit in rentals each fiscal year and receive nothing in exchange. Further, the corporation's action in claiming amortization deductions of the leasehold improvements on its income tax returns filed after December 31, 1948, indicates that the leasehold improvements were regarded as continuing to have value. The record further shows that no effort to liquidate any of the fixed assets had been undertaken by the corporation on December 31, 1948. Therefore, at that date it would be impossible to say, as petitioners have argued, that no amount would be recoverable on the alleged debt. We conclude that petitioners have not sustained their burden of showing the partial or complete worthlessness of the alleged debt as of December 31, 1948. The foregoing conclusion dispenses with the necessity of deciding the issue of the character of the open account "Due to stockholders" and the issue of net operating loss carrybacks. Decision will be entered for the respondent. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad debts. - (1) General Rule. - Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. This paragraph shall not apply in the case of a taxpayer, other than a bank, as defined in section 104, with respect to a debt evidenced by a security as defined in paragraph (3) of this subsection. This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection. ↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - (1) if incurred in trade or business; * * *
(k) Bad Debts. - * * *
(4) Non-business Debts. - In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩