Towers Warehouses, Inc. v. Commissioner.
Towers Warehouses, Inc. v. Commissioner
Docket No. 7862.
United States Tax Court
1947 Tax Ct. Memo LEXIS 327; 6 T.C.M. (CCH) 59; T.C.M. (RIA) 47013; January 27, 1947, Decided *327 Petitioner is held not to have established a cost to its predecessor of good will which petitioner entered on its books at $65,000 and, having acquired its business from such predecessor in a nontaxable reorganization, is not entitled to include such amount in its equity invested capital for computation of its declared value excess-profits tax and excess profits tax. Petitioner's consistent method over a term of years of accounting for labor costs charged to its customers and paid for in advance by them held to correctly reflect income. Benjamin Mahler, Esq., and William Ball, C.P.A., 11 West 42nd St., New York 18, N. Y., for the petitioner. William A. Schmitt, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: Respondent has determined deficiencies in declared *328 value excessprofits tax of $1,319.52 and excess-profits tax of $26,255 for the calendar year 1942. These deficiencies arise through respondent's action in eliminating from petitioner's equity invested capital, as reported, the sum of $65,000, which petitioner claims as the cost of purchased good will, and his disallowance of a claimed deduction of $10,308.79, the amount of an addition to a reserve for the estimated cost of labor to render service for which petitioner had already received payment from its customers. The issue presented in each instance is the correctness of the respondent's action. Findings of Fact Petitioner (hereinafter referred to as "Warehouses") is a New York corporation organized and incorporated December 22, 1922, with an authorized capitalization of $250,000 consisting of 2,500 shares of common stock of $100 per share par value. Its offices are at 545 W. 21st Street, New York City, and its return for the period here involved was filed with the collector of internal revenue for the second district of New York. It carries on the business of a bonded warehouse for the storing of imported goods after entry but prior to the payment of customs charges. On January 1, 1923, Warehouses *329 acquired from a predecessor company known as Towers Stores, Inc., (hereinafter referred to as "Stores") in consideration of the issue to that company of 1,080 shares of its authorized capital stock with a par value of $108,000, and $1,042.44 in cash, the bonded warehouse business theretofore carried on by Stores. The assets so acquired were set up on the books of Warehouses as follows: ASSETS ACQUIRED
Amounts Receivable
$ 42,047.77
Office Equipment
2,500.00
Warehouse Equipment
1,000.00
Good Will
65,000.00
Insurance & Other Prepaid
Expenses
1,040.63
Petty Cash Fund
25.00
Total
$111,613.40
CONSIDERATION PAID
Stock 1,080 Shares Par Value
$100.00 for Each Share
$108,000.00
Assumption of Liability for
Labor Out
2,570.96
Paid Cash
1,042.44
Total
$111,613.40
The business of Warehouses' predecessor, Stores, had been originally organized as a sole proprietorship by one George N. Tower in 1876 and operated as such by him continuously until January 1, 1914. A few days prior to the latter date, George N. Tower and two employees, Warren L. Finger and Percival C. Tickner, who had long been associated with him, organized a corporation, known as Towers *330 Stores, Inc., with an authorized capital stock of $15,000, consisting of 150 shares of a par value of $100 per share. All of this capital stock was issued for cash to these three individuals, $8,000 being subscribed and paid for by Tower, $4,000 by Finger, and $3,000 by Tickner. The minutes of the first meeting of directors of Stores record the receipt of a proposition by Tower to transfer to the newly organized corporation certain of the assets of his sole proprietorship, as follows: PROPOSITION New York, December 22, 1913. TO THE BOARD OF DIRECTORS OF TOWERS STORES INCORPORATED. Gentlemen: I am the owner of three leases covering warehouses properties, as follows: First. Property at 459-461-463 Washington Street, in the Borough of Manhattan, leased from Samuel Weil, which lease expires April 30, 1914; annual rental on the same being $7,000. Second. Property at 37-39 Vestry Street, in the Borough of Manhattan, leased from Robert H. Hazeltine, et al., which lease expires April 31, 1914; annual rental on the same being $4,000. Third. Property at 281-282-283-284 West Street and the connecting L in the rear known as Numbers 285-286-287 West Street Rear, in the Fifth *331 Ward, Borough of Manhattan, leased from the Hudson Navigation Company, which lease expires April 30, 1916; annual rental on the same being $9600. Subject to the consent of the lessors above named, I hereby agree to sell, assign, transfer and set over unto you the leases on the above properties, all my good will in the business of storage, warehousing, carting, etc., and the furniture used at my office, 281 West Street, for One Dollar. This transfer to take place as of January 1, 1914. I am to retain to myself and have paid to me, by your company all the book accounts, obligations, etc. due George N. Tower; also rentals and charges for storage, cartage, and other incidents of my business, which will accrue up to January 1, 1914; I to pay all expenses for the running of the business as heretofore until the same date. Should you decide to accept this proposition, I shall be glad to receive a letter from you to that effect. Yours truly, (Signed) George N. Tower. The minutes of the aforementioned meeting also record the acceptance of this offer. Stores thereafter operated and carried on the bonded warehouse business theretofore owned and operated by George N. Tower, the latter *332 being elected president at a salary of $8,000 per annum, Finger, as vice president and treasurer, at $6,000 per annum, and Tickner, as secretary, at $3,000 per annum. At the time of the organization of Stores, Tower was in bad health and, following the organization, he devoted little time in actively carrying on the affairs of the company. He came only occasionally to the offices of the company, but his salary was paid to him each year until the time of his death some years later. The salaries paid Tower for each of the years 1914 to 1917, inclusive, were deducted as expenses for those years by Stores on its returns. Stores, from the time of its organization until 1918, kept no regular books of account, but in the latter year an accounting system was installed upon an accrual basis and the proper permanent records maintained. Shortly after the organization of Stores, Finger and Tickner entered into a contract under which the stock held by each upon his death was to be sold to the survivor at a price of $500 per share and, upon the death of Finger several years later, his stock was acquired by Tickner at this price. The net income of Stores according to its tax returns filed from *333 1914 to 1918, inclusive, was as follows: 1914
$ 5,328.19
1915
5,262.66
1916
5,917.03
1917
5,225.31
1918
48,760.26
Subsequent to the organization of Stores and prior to the opening of permanent books of account, cancelled checks of the corporation show payments over the years 1914 to 1917, inclusive, to George N. Tower aggregating $30,403.74. These were in addition to salary payments made to him. The checks for these payments ranged in amount from $30 to $2,807.40. There is no record of Stores showing for what these payments were made. Stores and Warehouses, its successor, have at all times been engaged in the business of a bonded warehouse and have enjoyed an excellent business. The name of Tower has for many years been known among the importers of goods from other countries. These goods are received with bills of lading and consular invoices. Upon unloading they are placed in a bonded warehouse from which they may not be removed until payment of all customs duties. Upon receipt of goods in its warehouse, Warehouses issues a nonnegotiable warehouse receipt to the importer and requires the payment of storage for the first month together with payment of a *334 labor charge covering the handling of goods both in and out of storage. Both Warehouses and its predecessor have consistently accounted for the payments received from importers in the same manner. The amount received is, in each instance, credited to an account designated "Labor Charged In Advance." These goods are all baled, crated or packaged. The original amounts which petitioner has charged customers for handling both in and out, and which it has collected, were determined by it according to the particular weight and size of the individual shipment. In each instance the charge it has collected represents its estimate of the actual labor cost of handling the shipment both in and out plus an added amount as profit. At the close of each year petitioner makes an inventory of the goods in storage. The amount which it has determined as the actual cost to it of the labor to be performed in moving out the shipments shown by the inventory to be still in storage it accrues by a debit of this amount to the account "Labor Charged in Advance" and the balance then standing in that account, whether debit or credit, is carried to "Profit and Loss." This system of accounting has been consistently *335 followed by Warehouses and its predecessor during each year of their existence and the records show that in each year the amounts actually expended for labor very closely approximate the amount estimated to be so expended. In determining the deficiencies, the respondent has disallowed the deduction of $10,308.79, computed as estimated labor charges prepaid on shipments in storage upon the ground that liability for such payment had not yet been incurred by Warehouses. Warehouses' system of accounting for prepaid labor charges correctly reflected income. Opinion Warehouses acquired its properties from its predecessor corporation for stock in a nontaxable reorganization and, consequently, takes as a cost basis the cost of such assets to the predecessor. [1] Warehouses does not contend otherwise, but seeks to establish a cost of $65,000 to its predecessor, Stores, for good will acquired from George N. Tower in the acquisition, in 1914, of his sole proprietorship in a bonded warehouse. Petitioner attempts, first, to show the existence of valuable good will taken over from Tower upon the organization of Stores. Secondly, it is argued that certain payments made by Stores to Tower in *336 the years following its organization must be assumed to have been payments for something other than services and, consequently, must have been payments for the good will of the former business. We think the proof falls short of establishing any definite value for good will existing in the former sole proprietorship or that a payment was made by Stores for any good will as might have existed other than the $1 consideration recited in the offer by Tower to sell to the corporation, which the latter accepted. Warehouses offered no proof of the earnings of the business operated by Tower prior to 1914 - only the earnings of Stores subsequent to its acquisition of the business. Such evidence has little, if any, weight. As we said in Holters Co., 16 B.T.A. 325: * * * The petitioner also relies on the fact that since it was formed it has earned profits much in excess of a fair return on its investment in physical assets as evidence that it received more than bare manufacturing facilities and equipment from its predecessors. We have several times held that large profits *337 earned subsequent to incorporation is not convincing evidence that good will was acquired from predecessor concerns. * * * However, even were a substantial value established for good will possessed by the predecessor business and acquired by Stores, Warehouses would still be under the necessity of establishing its cost of such good will. Here, Warehouses has shown that in the three years following Stores' acquisition of the business from Tower, the latter was paid $30,403.74 by a number of checks in odd amounts issued over that period. It then argues that no consideration is established for such payments unless it be that there was an agreement to pay Tower for the good will of the business. It is insisted that the payment of $8,000 per annum salary to Tower, from the time of the organization of Stores up to the date of the acquisition of the business by Warehouses, could not be justified as a payment for services in view of the fact that Tower gave little time to the active conduct of the business by reason of his state of health. It is urged further that it must be assumed that the total of the payments to Tower must have been for the good will of his business and, since these *338 exceeded $65,000, at which figure good will was ultimately entered on the books of Warehouses, a cost in that amount to its predecessor is established. We are unable to agree with Warehouses' contention. In the first place, the "assumption" we are asked to make is squarely in conflict with the offer by Tower to Stores to sell the good will and certain other assets of his business for $1, which offer was accepted by Stores. We think it is inconceivable, moreover, that an agreement by Stores to pay Tower more than $65,000 for good will, which he had agreed to sell for $1, could have been made without the knowledge or consent of Tickner, the secretary of the corporation and one of its three stockholders. Yet Tickner did not so testify. Warehouses could hardly establish a cost of good will by salary payments made to Tower by Stores which the latter deducted in full as business expenses in making its return for each year. Moreover, the salary payments to Tower were continued by Warehouses after its acquisition of the business, and no contention is made that these were for anything other than services rendered. As to the unexplained payments of $30,403.74, made to Tower in the three *339 years following the organization of Stores, we need only say that a determination of fact can not be made upon the basis of such an unsupported assumption. In fact the evidence here would seem to justify a wholly different assumption. It is noted that the business formerly owned and operated by Tower was one of warehousing and cartage and, although the good will of the business was transferred to Stores, no physical equipment was included other than office furniture. The testimony of Tickner was that an incident of Tower's business was a large trucking business, the management of which was one of his duties, and that it operated 14 trucks. It is thus indicated that Tower, in his sale of the business, retained the trucking facilities. We think the natural assumption is that some, at least, of the payments subsequently made to him in odd amounts from time to time by the corporation were with respect to either trucking services rendered by Tower or for rental of his equipment. Furthermore, some of the payments must have represented collections of accounts receivable, which it will be noted were retained by Tower. We conclude that Warehouses has failed to establish the cost to it of *340 good will in any amount. Respondent's action in eliminating $65,000 from its equity invested capital is accordingly sustained. The second issue is decided by our finding that Warehouses' system of accounting for prepaid labor costs, established many years ago and consistently followed, correctly reflects its income. Under section 41, I.R.C., it is mandatory upon the respondent, under those conditions, to approve such system of accounting. Huntington Securities Corp. v. Busey, 112 Fed. (2d) 368; Morris-Poston Coal Co. v. Commissioner, 42 Fed. (2d) 620. We think our finding is amply justified. The addition to reserve by Warehouses was disallowed by respondent on the ground that the liability had not yet been incurred by Warehouses. It is evident that respondent had in mind Warehouses' liability to its laborers who had not yet performed the services for which Warehouses had been paid. He overlooks the fact that Warehouses had incurred a very definite and fixed liability to its customers to perform, at no additional cost to them, this service no matter what it should cost and had been paid in full by its customers for such services. *341 It should be kept in mind that we do not have here a contingent liability which, of course, would not be subject to accrual. This liability was fixed. The fact that the exact amount which it was later necessary to pay could not be determined does not preclude the accrual of the liability in an amount estimated with reasonable accuracy. In Houghton & Dutton Co., 26 B.T.A. 52, petitioner had assumed a liability with respect to certain issued trading stamps. We approved the deduction of a so-called reserve in an estimated amount set up to meet the obligation. In so doing, we called attention to the fact that although the account was designated as a reserve, it was, in fact, the mere accrual of the liability, which was fixed. In J. B. Jemison, 18 B.T.A. 399, petitioner had made shipments with respect to which it was indebted for freight charges, but the amount of these could not be determined and payment made until the following year. It had long been the practice of the taxpayer to accrue these liabilities in an estimated amount. In approving this practice, we said: The procedure of the partnership in computing entering the accruals has been consistently *342 followed every year; we have repeatedly given weight to consistency, see Higgenbotham-Bailey-Logan Co., 8 B.T.A. 566; Leedom & Worrall Co., 10 B.T.A. 825; Holeproof Hosiery Co., 11 B.T.A. 547; Blumberg Brothers Co., 12 B.T.A. 1021; National Straw Works, 16 B.T.A. 463, and many other decisions too numerous to cite here. We know of no good reason for revising that procedure. The liabilities were definitely incurred within the years at the end of which they were accrued upon the books. The accruals were proper, even though lacking exactitude. United States v. Anderson, 269 U.S. 422. If they occasioned minor overlappings through the practice of entering the slight corrections in the subsequent year, that would appear to be authorized by article 111 of Regulations 62, which provides, among other things: It is recognized, however, that particularly in a going business of any magnitude there are certain overlapping items both of income and deduction, and so long as these overlapping items do not materially distort the income they may be included in the year in which the taxpayer, pursuant to a consistent policy *343 takes them into his accounts. Warehouses' books have been maintained on this method of accounting for more than 25 years, with unvarying consistency. Its income tax returns were made and accepted on that basis. Such a case is one to which the language of the Court in Osterloh v. Lucas, 37 Fed. (2d) 277, is peculiarly applicable. There it is said: * * * In our opinion, all that is meant is that the books shall be kept fairly and honestly; and when so kept they reflect the true income of the taxpayer within the meaning of the law. In other words, the books are controlling, unless there has been an attempt of some sort to evade the tax. This construction may work to the disadvantage of the taxpayer or the government at times, but if followed out consistently and honestly year after year the result in the end will approximate equality as nearly as we can hope for in the administration of a revenue law. The action of respondent in his disallowance of the deduction for the accrued labor cost is disapproved. Decision will be entered under Rule 50. Footnotes
1. I.R.C. Sec. 112 (b) (4) and (5); Sec. 112 (g)↩; Sec. 113 (a) (7) (A) and (B).