## LUHRING MOTOR COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 80278. Filed July 17, 1964.

*William C. Baskett* and *George H. Bowers, Jr.*, for the petitioner.
*Bart A. Brown, Jr.*, for the respondent.

FISHER, *Judge:* Respondent determined deficiencies in petitioner's income tax for the year 1955 in the amount of $119,152.02.

The issues presented for our consideration are:

Whether the entire amount of finance charges provided for in conditional sales contracts received by petitioner during 1955 constitutes income to petitioner as of the time the contracts were entered into, or whether the charges are to be accrued as income ratably over the lives of said contracts;

Whether petitioner is entitled under section 167(a) of the 1954 Code [1] to an allowance of depreciation for the taxable year 1955 on 42 automobiles assigned to its officers, department heads, and an equipment pool; and

Whether petitioner is entitled to capital gains treatment on its sale in 1955 of 11 automobiles assigned to certain individuals in its employ for general use in company business, which automobiles were held for less than a year before sale.

FINDINGS OF FACT

*Issue 1. Finance Charges*

The facts are partly stipulated and, to the extent so stipulated, are incorporated herein by reference.

Luhring Motor Co., Inc. (sometimes hereinafter referred to as petitioner), was organized under the laws of the State of Virginia in 1946. Its offices and principal place of business during 1955, the taxable year here in question, were located at Norfolk, Va.

Petitioner is an accrual basis taxpayer and filed its income tax return on that method for the calendar year 1955 with the district director of internal revenue at Richmond, Va.

Since its inception and during the year in question, petitioner conducted an automobile dealership in Norfolk, Va. It operated during that period under a franchise from the Chrysler Corp., selling new

---

[1] All references are to the Code of 1954 unless otherwise indicated.

Plymouth and Dodge automobiles and Dodge trucks. It also operated a used car lot, a used car reconditioning department, a parts department, a body department, a repair shop, and a service department.

A substantial portion of the sales of its cars were credit sales negotiated in the following manner:

Petitioner and its customer would reach an agreement on the "selling price" or "cash delivered price" of the automobile to be purchased. The selling price was then reduced by either an allowance for any autos traded in pursuant to the sale, or a downpayment, by the buyer, in cash or by the sum of both, to arrive at the "balance due on the selling price" of the car. Because the credit sale involved a deferring of payment of the purchase price over a period from 1 to 2 years, petitioner added to the "balance due on the selling price," the cost of insurance on the auto for the payment period, and a finance charge. The aggregate was usually termed the "total amount of the contract." This sum was then divided by the number of months over which the contract was to run and the result thereof constituted the monthly installment due.

Petitioner and the prospective customer would then execute a written conditional sales contract (hereinafter referred to as the contract). The contract provided as follows:

LUHRING MOTOR CO., INC.

TWENTY-FIRST STREET

Norfolk 10, Virginia

The undersigned seller hereby sells, and the undersigned purchaser or purchasers, jointly and severally, hereby purchase(s), subject to the terms and conditions hereinafter set forth, the following property, delivery and acceptance of which in good order are hereby acknowledged by purchaser, viz:

(Description of Automobile)

A. For a TOTAL TIME PRICE (Sum of items 2 and 9) of_____ $_____
   Computed as follows:
   1. CASH SALE DELIVERED PRICE (including accessories
      or extras, if any)_____ $_____
   2. TOTAL DOWN PAYMENT under installment sale
      Consisting of $_____ plus $_____
                    (Net trade-in)        (Cash)
   3. DIFFERENCE BETWEEN ITEMS 1 and 2_____ $_____
   4. COST and type of Insurance Coverage:

       *    *    *    *    *    *    *

   Total Cost of Insurance_____ $_____
   5. OTHER CHARGES, if any_____ $_____
   6. PRINCIPAL BALANCE (Add items 3, 4 and 5)_____ $_____

       *    *    *    *    *    *    *

   8. FINANCE CHARGE _____ $_____
   9. BALANCE DUE _____ $_____

Payable at the office of Luhring Motor Co., Inc. in _____ installments of $_____ each, commencing _____, 19____ and on the same day of each successive month thereafter. The final installment shall equal the amount of balance remaining due.

B. Upon any default by Purchaser in making payment of any of aforesaid installments, or in performing any of the conditions, provisions or covenants of this agreement, the then holder hereof, at its option and without notice, may declare all unpaid installments to be due and payable forthwith. Each installment not paid on its due date shall bear interest at the rate of 6% per annum from the due date until paid, which interest Purchaser covenants and agrees to pay. Purchaser consents to the sale, assignment and delivery of said agreement by Luhring Motor Co., Inc., and agrees that no transfer or assignment of this agreement, or extension or renewal of any obligation hereunder, shall pass title to said motor vehicle, equipment and accessories, or be construed as a waiver of any rights herein by the said Company.

C. Title to the motor vehicle, its equipment and accessories, shall not pass by delivery to the Purchaser, but shall remain vested in and be the property of the Seller or Assigns until the time balance and all other sums which may become due hereunder have been fully paid in cash. Purchaser agrees to settle all claims against Seller directly with Seller, not to set up any such claim in any action brought by Assignees, and to operate and control said motor vehicle in conformity with all Laws and Ordinances of the State of Virginia and to indemnify and save harmless the Seller or Assigns from any and all loss or damage to persons or property caused by said motor vehicle or by the use and operation thereof to which Seller or Assigns might possibly be subjected.

This agreement constitutes the entire agreement between the parties, and no waiver or modification of its terms shall be valid unless written upon or attached to this contract and signed by the parties. No representations or warranties are made by Seller that are not contained in this agreement.

D. Purchaser agrees to pay all taxes, license fees or charges against said motor vehicle and to keep same in good condition and adequately insured for an amount not less than the unpaid balance due seller, with loss payable to Seller or Assigns, who may insure their interest at Purchaser's expense and be secured therefor hereby should Purchaser fail so to do, and that any equipment, repairs or accessories placed upon said motor vehicle shall be at Purchaser's expense and become a component part therof and included in the terms of this agreement, and that the loss, injury or destruction of said motor vehicle shall not release said Purchaser from payment as provided herein. In the event of cancellation of ANY insurance policy covering the said automobile or the use therof, then in that event Purchaser agrees to immediately surrender possession of said automobile to Seller or pay unto the said Seller the entire balance due on said automobile which said balance shall become due and payable upon the date of cancellation. Purchaser further agrees not to use or permit said motor vehicle to be used for passenger hire.

E. Should the Purchaser fail to keep and perform any or all of his agreements herein contained, and to promptly pay at maturity any and all sums due hereunder, or if said motor vehicle is removed or attempted to be removed from the State in which the Purchaser now resides, or be otherwise disposed of, or if Purchaser shall lend, sell or encumber, or shall attempt to lend, sell or encumber said motor vehicle, or in case of misuse or abuse thereof, or whenever the Seller or Assigns shall deem the debt insecure, said Seller or Assigns may without any demand or notice take possession of said motor vehicle, equipment and accessories, wherever found and without process of law, and thereupon

all rights of the Purchaser hereunder shall cease and terminate, and Seller or Assigns may retain all sums paid by the Purchaser, not as a penalty, but as and for liquidated damages, loss in value of said motor vehicle, and rental value thereof. Seller or Assigns may take possession of any other property in said motor vehicle at the time of repossession and hold the same for Purchaser without responsibility or liability therefor. Purchaser does hereby expressly waive any right of action founded in tort, contract or otherwise which the Purchaser may claim to have in the future against the Seller or Assigns arising out of the removal, repossession or retention of said motor vehicle or arising out of any action or procedure, civil, criminal or otherwise, taken against the Purchaser or Assigns because of the breach of any of the provisions of this contract Purchaser agrees that the motor vehicle shall remain in and shall not be removed from the State wherein the Purchaser now resides, and if . for any reason Purchaser gives up or losses [sic] possession of said motor vehicle, all unpaid balance of said purchase price shall forthwith become due and payable.

F. Seller or Assigns may, by suit or otherwise, enforce payments due hereunder, and no legal proceedings with respect thereto shall be deemed a waiver of any of said rights of Seller to take possession on default or breach as aforesaid. Upon the Seller or Assigns so taking possession of the motor vehicle, Seller or Assigns may sell the motor vehicle at public or private sale at any time thereafter without any notice to the Purchaser, and said Seller or Assigns may become the purchaser thereof, and if the proceeds therof are insufficient to pay all sums remaining unpaid hereunder and the expense caused by such repossession, removal, reparation, storage, liens, and sale, including a 15% attorney's fee, incurred in taking possession of said motor vehicle, or in or about the sale thereof, or in collecting in any manner any sums which may be due and owing hereunder, the Purchaser agrees to pay any deficiency, not as a penalty, but as liquidated damages for the breach of this contract. The waiver or indulgence of any default shall not operate as a waiver of subsequent defaults. Time is of the essence of this agreement and Purchaser agrees that in the event this contract is placed in the hands of an attorney for collection, to pay 15% of amount due as attorney's fees.

G. This agreement shall apply to and bind the heirs, executors, administrators and assigns of the Purchaser, and shall inure to the benefit of the Seller and Seller's heirs, executors, administrators, successors and assigns, and all rights and remedies of the Seller herein or otherwise provided may be exercised by Seller's heirs, executors, administrators, successors and assigns. Purchaser· hereby waives all exemptions under the homestead and bankruptcy laws as to all sums due or to become due under this agreement. Any instrument required by law to be filed or recorded upon full payment being received by the Seller or Assigns shall be prepared by the Purchaser and properly entered by him after execution by the Seller or Assigns.

H. *Information contained in Seller's Invoice to Purchaser shall be read as a part of this Instrument.*

The finance charge provided for in the contract consisted of two elements. The principal element was interest charged by petitioner for the privilege of making deferred payments on the amount of the selling price outstanding and remaining to be paid over the term of the contract. The other element was a charge to the customer for

the expenses of collection of the purchase price due, and the clerical work incurred by petitioner in servicing the contract.[2]

Prior to May 1955, petitioner discounted these contracts with a banking institution as soon as they were executed. On discount, the bank paid petitioner cash in the amount of the balance due on the selling price and petitioner guaranteed the entire amount of the contract. Upon receipt of the cash from the bank, petitioner, in its records, debited its cash account with the amount of cash and credited the receivable account for the same amount.

About May 1, 1955, petitioner established a finance department (hereinafter referred to as Finance) within its corporate organization to handle the financing of the credit sales. This department had a separate bank account and separate books and records of account from those of the automobile sales department.

To facilitate financing of such sales by its own firm, petitioner first obtained bank loans of approximately $850,000 on 90-day notes with a right to renew. These loans were used to purchase for cash new cars from the manufacturer which were, in turn, sold to petitioner's customers on credit. Petitioner was required to pay interest in accordance with the terms of the bank loans.

From the inception of Finance, petitioner stopped discounting its contracts with the banks and instead turned them over to Finance. Petitioner continued to negotiate sales and compute the sales price in the precise manner as it had done previously. It used the identical contract form which it had employed prior to May 1955, but under the new operation it merely transferred the contract to Finance upon its execution and Finance would then issue a check from its bank account payable to the automobile sales department for the "amount of the balance due on the selling price."

On its books and records for the automobile sales department, petitioner handled the transaction subsequent to May 1955 in the following manner:

The selling price or cash delivered price of the automobile was the only amount credited to its income account and any downpayment and/or trade-in was debited to the respective asset accounts and there was a debit to an account receivable account for the balance. These entries were made at the time the contract was executed.

Upon receipt of the contract by Finance, the entries on its books and records of accounts were handled in the following manner:

The total amount of the contract plus the total finance charges were debited to an account entitled "Contracts Purchased" and there was

[2] The finance charge was computed by reference to a booklet showing the "total amount of the contract," the amount of the monthly payments, and the total finance charge itself, which charge was based on the number of months over which the purchase price was to be paid.

a credit to its cash account for the amount of the check paid to the sales department. (Upon receipt of the cash by the sales department, it credited the accounts receivable balance and debited cash for the amount of the check.) The total finance charge was credited to an account entitled "Unearned Discount." That charge was divided by the number of installment payments provided for in the contract, and upon the payment of each installment, the unearned discount account was debited in the amount of the charge paid and an income account entitled "Earned Discount" was credited for that same amount. Petitioner followed this practice regardless of whether it actually received the monthly installment due and made the necessary entries until the balance in the unearned discount account was eliminated or until the contract was terminated. If the purchaser elected to accelerate payment of the outstanding balance due under a sales contract, it was the custom of petitioner, as well as other automobile dealers in the geographical area, to abate the remaining unpaid finance charge for the unexpired term of the contract, although there was no express provision for abatement in the contract. Purchasers under conditional contracts of sale in the area were familiar with the custom to abate the remaining unpaid finance charges upon acceleration of payment and petitioner would have been unable to compete for their business if it had not abated such charges.

The finance charges so abated were never credited to the earned discount account but were written off by petitioner on the books and records of Finance by a debit to the unearned discount account and a credit to the contracts purchased account for the amount of unpaid finance charges remaining.

Petitioner's method of accounting for finance charges in connection with the conditional sales contracts for the period May 1 through December 31, 1955, was in accord with the accounting standards and practices prescribed by the American Institute of Certified Public Accountants and was used by various firms which were engaged in financing such transactions.

From May 1 through December 31, 1955, petitioner entered into 830 contracts. The total finance charges arising therefrom were $277,-051.34. Petitioner ultimately credited the total finance charges with respect to 446 of these contracts to its earned discount account. Of this total $53,234.50, or approximately 19.2 percent, was abated as a result of accelerated payments or canceled contracts.

In computing the addition to reserve for bad debts for 1955, the balance in petitioner's "Contracts Purchased" account was reduced by the balance in the "Unearned Discount" account. Petitioner did not deduct from its taxable income for 1955 any amount for bad debts based on the balance in its "Unearned Discount" account as of December 31, 1955. Petitioner's account entitled "Reserve for Bad Debts"

on its 1955 return did not include any amount based on the balance in its "Unearned Discount" account as of December 31, 1955.

In its income tax return for 1955, petitioner reported $42,187.29 of the $277,051.34 of finance charges as income, which corresponded to the amount it had credited to the earned discount account from May 1 through December 31, 1955.

OPINION

## Issue 1. Finance Charges

The instant case is another in the spate of recent decisions involving deferred income in which a taxpayer's consistent accounting system is being challenged by respondent. In his statutory notice of deficiency, respondent determined that finance charges in the aggregate amount of $217,509.41 provided for in conditional sales contracts made by petitioner during 1955, and credited on its books to "Unearned Discount" (deferred income) constituted taxable income in full during that year. Essentially, it is respondent's position that pursuant to general principles of accrual tax accounting, the right to receive the total finance charges in dispute herein became fixed as of the date of the execution of the conditional sales contracts in the taxable year 1955, and, therefore, all such charges are includable in petitioner's income for that year. Petitioner, in opposition, contends that it properly included in its income for 1955 the amount of $42,187.29 in its earned discount account representing the total of all monthly finance charges on the contracts earned during said year, and that the balance of $217,509.41 in its unearned discount account as of December 31, 1955, represented the total of all subsequent monthly finance charges on contracts held as of that date which were to be earned ratably over the contract periods of 1 to 3 years if the contracts were not canceled or terminated. We agree with petitioner.

Respondent's determination is, of course, presumptively correct and the burden of proof is upon petitioner to show that it is entitled to spread the finance charges enumerated in the contracts executed in 1955 over the life of said contracts. *Permanent Homes Land Co.*, 27 B.T.A. 142, 149 (1932). As a corollary, we also recognize that under section 446 of the 1954 Code [3] respondent has a broad discretion in

---

[3] SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

(c) PERMISSIBLE METHODS.—Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting—

\* \* \* \* \* \* \*

(2) an accrual method;

determining whether the method of accounting employed by a taxpayer clearly reflects income. *Commissioner* v. *Hansen*, 360 U.S. 446 (1959); *Aptitude Associates, Inc.* v. *Commissioner*, 324 F. 2d 499 (C.A. 4, 1963), affirming per curiam a Memorandum Opinion of this Court.

Pursuant to section 446, *supra*, the taxable income of petitioner is to be computed according to the method of accounting employed by him in keeping his books and records of account as long as that method clearly reflects income. Accordingly, any item of income is to be included in the income of the taxpayer when received unless the method of accounting employed by him requires the inclusion at some other time.[4] Petitioner, having elected to employ an accrual method of accounting as authorized by section 446, *supra*, may thereby be required to report income at a time different than the time of receipt. Under an accrual method, income is to be reported for the taxable year in which all the events which fixed the right to receive such income and the amount thereof can be determined with reasonable accuracy.[5] Until the right to receive an item of income becomes fixed, the taxpayer is under no duty to report it as income. Any other method might result in the paying of a tax on income which the taxpayer may never have the right to receive. *United States* v. *Consolidated Edison Company of New York, Inc.*, 366 U.S. 380 (1961); *Spring City Foundry Co.* v. *Commissioner*, 292 U.S. 182 (1934).

The cardinal rule in the Federal income tax system is that net income must be computed and taxed on an annual basis so as to provide revenue to the Government at regular intervals; and, hence, income may not be accelerated or postponed from one taxable year to another in order to reflect the ultimate result of a business transaction. *Burnet* v. *Sanford & Brooks Co.*, 282 U.S. 359, 363 (1931). Elementary principles of accrual accounting require that items of income be considered reportable income only in the year they are earned by taxpayer's ren-

---

[4] SEC. 451. GENERAL RULE FOR TAXABLE YEAR OF INCLUSION.

(a) GENERAL RULE.—The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

[5] Sec. 1.446–1, Income Tax Regs., provides:

Sec. 1.446–1 General rule for methods of accounting.

(c) *Permissible methods.*—(1) In general. Subject to the provisions of paragraphs (a) and (b) of this section, a taxpayer may compute his taxable income under any of the following methods of accounting:

   *        *        *        *        *        *

(ii) *Accrual method.* Generally, under an accrual method, income is to be included for the taxable year when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. Under such a method, deductions are allowable for the taxable year in which all the events have occurred which establish the fact of the liability giving rise to such deduction and the amount thereof can be determined with reasonable accuracy. The method used by the taxpayer in determining when income is to be accounted for will be acceptable if it accords with generally recognized and accepted income tax accounting principles and is consistently used by the taxpayer from year to year. * * *

dition of the services (or, as here, extension of credit and servicing of installment payments) for which the payments were or are to be made. Accordingly, all items of income, such as "finance charges," are to be included in gross income by an accrual basis taxpayer only in the year in which the taxpayer's right to receive payment has become fixed and certain with reasonable accuracy.

The pivotal inquiry, therefore, is what scope is to be given to the words as contemplated by sections 446 and 451, both *supra*. For a comprehensive history of the legislative background and conceptual development of these sections, see Freeman, "Tax Accrual Accounting for Contested Items," 56 Mich. L. Rev. 727 (1958) ; S. Rept. No. 372, 84th Cong., 1st Sess., p. 6; H. Rept. No. 1337, 83d Cong., 2d Sess., p. 48. The issue involved herein requires a review of the manner in which the finance charges in controversy arose and a determination of the period in which it became accruable as taxable income.

The record shows that from its inception through and including the taxable year 1955 involved herein Luhring Motor Co., Inc., sold a substantial number of its automobiles on a credit sales basis in which the customer was given a period of 1 to 2 years to pay the balance of the purchase price. For the privilege of deferring payment of said balance, the purchaser obligated himself to pay what petitioner designates as a "finance charge." The term "finance charge" is not a term of art since its meaning is both erratic and elastic. *Commissioner* v. *Hansen*, 360 U.S. 446 (1959). The finance charges provided for in the conditional sales contracts herein consisted of two elements. The principal element was interest charged by petitioner for the privilege of permitting the purchaser to make deferred payments on the balance of the selling price of the automobile financed over the full life of the contract. The other element was a charge to the customer to absorb petitioner's clerical and collection costs incurred in servicing the contract. In a typical sales transaction involved herein on a deferred payment basis, the selling price, excluding insurance and finance charges, is earned when the sale is consummated. The petitioner has an unconditional right to receive the selling price and petitioner must include the selling price in its gross income at the time of sale. The sale, which has been consummated, is the identifiable event which fixes the rights of the parties. However, the finance charges (interest and collection charges) have not been earned at the time of said sale; they are to be earned, if at all, ratably over the full life of the contract. The total finance charge is divided by the number of monthly payments to determine the monthly finance charge. Each month thereafter petitioner transfers said payment to the earned discount account including in its income the monthly finance charge whether or not the monthly payment is received from the customer. If the contract is canceled or terminated at the election of the purchaser by accelerated

payment of the outstanding balance of the amount financed, the total amount of the monthly finance charges for the unexpired months of the contract is eliminated by abatement and is never included in petitioner's income. In the event the customer was to pay the entire outstanding balance of the purchase price prior to the time it became due and payable, the liability for payment of it would be abated by petitioner and extinguished from its books of account.

As we view the overall sales transaction, the seller's right to receive the finance charge in question was wholly dependent upon the passage of time. Petitioner's right to the monthly payment of finance charges ripened or became fixed as each installment fell due. Performance by the seller of the obligations (i.e., extension of credit and administrative servicing of the installment contract) to be rendered in exchange for the finance charges was not completed in an economic and bookkeeping sense until each month elapsed. *Texas Trailercoach, Inc.*, 27 T.C. 575, 580 (1956), reversed on the dealer's reserve issue which is not involved herein, 251 F. 2d 395 (C.A. 5, 1960).

Specifically, with respect to the interest charges involved, which apparently constituted the major part of the finance charges in dispute, we believe that said charges accrued ratably over the life of the sales contract. Interest has been defined in a concise manner as "the compensation allowed by law or fixed by the parties for use, or forbearance or detention of money." *Fall River Electric Light Co.*, 23 B.T.A. 168 (1931); *Deputy v. Dupont*, 308 U.S. 488 (1940). See also *Elk Discount Corporation*, 4 T.C. 196, 200–201 (1944). In *Carlson v. City of Helena*, 39 Mont. 82, 102 Pac. 39, the court said (p. 44):

Interest is merely an incident to the debt, to be paid from time to time or at the date when the principal falls due, in consideration of the forebearance extended to the debtor, and becomes a part of the debt, or a debt at all, only when it has been earned. * * *

It is axiomatic that the term "accrue" in regard to interest is used in the sense of continuous growth rather than of sudden acquisition. While the amount due and payable is determinable at any given moment, interest does not in a strictly legal sense accrue until it becomes due and payable. Interest can be said to accrue day to day, or ratably over an elapsed period of time. *Gunderson Bros. Engineering Corp.*, 42 T.C. 419 (1964); *Lake Charles Naval Stores*, 25 B.T.A. 173, 176 (1932); *J. B. Jemison*, 18 B.T.A. 399, 403 (1929); *Higginbotham-Bailey-Logan Co.*, 8 B.T.A. 566, 577 (1927); *Anderson & Co.*, 6 B.T.A. 713, 717 (1927); *Chatham & Phenix National Bank*, 1 B.T.A. 460 (1925). See also *Natco Corp. v. United States*, 240 F. 2d 398, 400 (C.A. 3, 1956).[6]

---

[6] It is noteworthy that respondent has ruled with respect to U.S. savings bonds, both series G and series K, that interest is includable in gross income for accrual basis taxpayers when it becomes payable but not until then. Mim. 5184, 1941–1 C.B. 197; I.T. 4110, 1952–2 C.B. 99; I.T. 3504, 1941–2 C.B. 93; Rev. Rul. 59–271, 1959–2 C.B. 70.

Likewise, we believe that the collection charges involved herein (also part of the finance charges) incurred in collecting installments of the contracts under review are no different from any other expense of carrying on the business of selling automobiles on the deferred payment basis, and affect income only when actually incurred. *Anderson & Co., supra* at 718. Essentially, this portion of the finance charge represented a service fee for handling the installment sale when consummated and covered the entire life of the contract including collection of the installments due. In our opinion, the collection charge herein depended for its ultimate amount upon the duration of the administrative services to be rendered. See *Southern Abstract & Loan Co.* v. *Commissioner*, 72 F. 2d 130 (C.A. 6, 1934), affirming 25 B.T.A. 1095 (1932). As in the case of interest, petitioner's right to receive the collection or handling charges only became fixed and the amount determinable with reasonable accuracy upon the passage of time and servicing of the customers' outstanding debts by the petitioner; and such right matured only at the time each installment was due and payable. *Spring City Foundry Co.* v. *Commissioner*, 292 U.S. 182 (1934).

The event which renders the purchaser liable for the total finance charge is not the execution of the conditional sales contract, but rather it is the passage of time without his making any early payment. In our view, this is not the case of a condition subsequent (which renders the right to the total amount of finance charges subject to defeat on the occurrence of prepayment), as respondent urges, but rather the case of a condition precedent. *Gunderson Bros. Engineering Corp., supra* at 428.

The record also shows that the conditional sales contract form used by petitioner in connection with its credit sales is the usual form used by automobile dealers and finance companies doing business in the Tidewater Virginia area. Finance charges are shown separately on petitioner's contract form. Although there is no express provision for abatement of finance charges in the contract, the evidence is clear that it was the custom of petitioner, as well as other automobile dealers in the environs of the Tidewater, to abate the remaining unpaid finance charge for the unexpired term of the contract. Purchasers in the area were familiar with this custom with respect to conditional sales contracts in the automotive business, and petitioner would have been unable to compete for their business if it had not abated such charges. Finance charges so abated were never credited to the earned discount account but were written off by the petitioner on its books by a debit to the unearned discount account and a credit to the contracts purchased account for the amount of unpaid finance charges remaining.

Petitioner and its numerous customers dealt according to the aforesaid custom to abate finance charges in the event of cancellation or

termination of the contract, and their conduct in this connection is not without probative value. It is undisputed that unearned finance charges were abated in every instance in which a contract held by petitioner was canceled or terminated. Of the total finance charges of $277,051.34 on the 830 contracts entered into by petitioner between May 1 and December 31, 1955, the sum of $53,234.50 or approximately 19.2 percent was abated in subsequent years.[7]

Tax incidence should reflect the economic realities and practical considerations of a business transaction, including the customs of the particular industry under review. Viewing the entire transaction involved herein in terms of established competitive practices of the automotive industry in the Tidewater Virginia area, we believe that the parties to the contracts in question intended to have dealt in accordance with the customs and usages of the automotive market in their locale. As stated succinctly in *Hostetter* v. *Park*, 137 U.S. 30, 40 (1890):

> It is well settled that parties who contract on a subject matter concerning which known usages prevail, incorporate such usages by implication into their agreements, if nothing is said to the contrary. * * *

While the contracts involved herein do not specifically provide for abatement, we are not limited in our inquiry to the instrument itself. We may look at all the surrounding circumstances to determine whether the real intention of the parties is consistent with the purport of the instruments. Recitations in the contract are, of course, factors to be considered but are not conclusive and do not preclude us from consideration of all the facts of record. *Gooding Amusement Co., Inc.*, 23 T.C. 408, 418 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956), certiorari denied 352 U.S. 1031 (1957); *Proctor Shop, Inc.*, 30 B.T.A. 721, 725 (1934), affd. 82 F. 2d 792 (C.A. 9, 1936). Analysis of the contracts involved herein in the context of surrounding circumstances, and particularly the usages of the automotive trade in the Tidewater area, leads us to conclude that the contracting parties never intended that petitioner should have a fixed right at the time of sale to the entire amount of the finance charges reflected in the sales contract, regardless of subsequent events.

In connection with the customs and usages of the trade in petitioner's locale, a bank officer in charge of, *inter alia*, the purchase of conditional sales contracts from automobile dealers in Tidewater Virginia testified that petitioner's contract form was similar to the contracts purchased by his bank from other automobile dealers. The witness

---

[7] In this connection it is noteworthy that some jurisdictions specifically limit by statute the amount of finance charges with respect to a conditional sales contract of a motor vehicle, and, accordingly, require a reduction in finance charges in the event of prepayment of the contract price. See *Arthur V. Morgan*, 29 T.C. 63, 69 (1957), affd. 277 F. 2d 152; *Gunderson Bros. Engineering Corp.*, 42 T.C. 419, 429 (1964).

also stated that the maximum fair market value of a conditional sales contract between petitioner and its customer at the time it is executed is the amount of the balance due on the selling price of the automobile, exclusive of any finance charges. We have carefully considered the official's testimony and find it credible.

In *Smith Motors, Inc.* v. *United States*, an unreported case (D. Vt. 1961, 8 A.F.T.R. 2d 5336, 61-2 U.S.T.C. par. 9627), the taxpayer, an automobile dealer, sold automobiles on a deferred payment plan. The sales price, including a carrying charge which was paid monthly, and the contract provided for a reduction of said charge in the event of early payment. The total carrying charge was credited to a deferred income account and only picked up in annual income as each installment became due. The taxpayer used the accrual method of accounting. Holding that the taxpayer was permitted to accrue finance charges over the life of the contracts, the court said:

The method used here by the taxpayer clearly reflected his income. If he had reported as income the total possible carrying charges at the time of the sale, his taxable income would be distorted. The reason for this is that if a purchaser were to pay the entire amount due for the vehicle purchased in a shorter time than called for by the contract, the taxpayer would be reporting as income, carrying charges not only that never would be received but that never accrued. Therefore, under the method adhered to by the Commissioner, the taxpayer would be required to report as income earnings that never accrued as the carrying charge in each particular month would never accrue or become earned until the completion of that pay period. By reporting the entire amount of carrying charges at the time of the sale, the taxpayer's income would be erroneous. * * *

After a careful analysis of the record, we are of the opinion that there are no essential differing facts or accounting procedures used by petitioner that would distinguish the instant case from *Smith Motors, Inc.* v. *United States, supra*.

Subsequent to the filing of briefs by the parties herein, the Supreme Court handed down its most recent decision in *Schlude* v. *Commissioner*, 372 U.S. 128 (1963), which reversed in part 296 F. 2d 721 (C.A. 8, 1962), which had affirmed our decision reported at 32 T.C. 1271. In *Schlude*, the taxpayer's studio income, computed on the accrual method of accounting, included cash downpayments, contract installments due and payable, and negotiable notes. The Supreme Court held that the amounts representing cash receipts, notes received, and "contract installments due and payable" are includable in gross income for the taxable year in which such payments were actually received and receivable. The Supreme Court did not include any installment payments in taxpayer's gross income which were not due to him and "which included amounts for which services had not yet been performed and which were not due and payable during the

respective periods." In this connection, the Supreme Court stated (p. 133):

the Commissioner, * * * has retreated somewhat and does not now claim the includibility in gross income of future payments which were not evidenced by a note and which were neither due by the terms of the contract nor matured by performance of the related services.[6] * * *

[6] Upon reconsideration, however, we concede the error of accruing future payments which are neither due as a matter of contract, nor matured by performance of the related services. Indeed, the Studio's right to collect the installment on its due date depends on its continuing ability and willingness to perform. Until that time, its right to receive payment has not fully ripened. Brief for the United States, p. 67.

Because of the Commissioner's concession, the Supreme Court reversed that part of the Court of Appeals decision which included amounts for which services had not yet been performed and which amounts were not due and payable during the respective periods.

In the instant case petitioner received a cash downpayment, and the conditional sales contract (which reflected the cash downpayment) required periodic installment payments of the balance of the total purchase price, including total finance charges. The total finance charges were divided by the number of monthly payments to determine the amount of monthly finance charges payable. The total purchase price, excluding the finance charges, was reported as income in the year of sale since petitioner did not elect to report income by use of the installment method as provided under section 453 of the 1954 Code. Each month after a typical sales transaction such as involved herein, petitioner transferred the monthly finance charge to the earned discount account whether or not the monthly payment was received from the customer. If the contract was canceled or terminated, the total amount of the monthly finance charges for the unexpired months of the contract was eliminated by abatement and never included in petitioner's income.

While there are some technical distinctions between *Schlude* and the instant case, we believe that the net result is the same and we think the same principles of tax accounting should be applied. Accordingly, we find that the monthly installments of finance charges set forth in the conditional sales contracts involved herein, which are not due or payable during 1955, are not includable in petitioner's income for that year.

In the light of the foregoing, and the record as a whole, we hold that petitioner's method of reporting a portion of the finance charge as income as each installment became due and payable clearly reflected its income and was proper.

*Issues 2 and 3. Depreciation and Capital Gains*

Each year, upon the introduction of new model automobiles by the Chrysler Corp., petitioner purchased for cash from that manufacturer a supply of new Plymouth and Dodge automobiles. While the majority of these automobiles were held for immediate sale to the general public, petitioner assigned certain of them to its officers, department heads, and equipment pool, but did not generally assign any to its salesmen as such. The discretion to make assignments of these assets to its employees rested with petitioner's president who exercised that authority upon consultation with the department heads. The automobiles so assigned were designated as "company cars" and used for such purposes as: (1) Transportation of various officers and employees for business purposes; (2) transportation of personnel for solicitation of business on cars and trucks; (3) use by customers when their own automobiles were left with petitioner for extensive repairs; (4) transportation of customers for their convenience; (5) transportation of Chrysler Corp. employees when visiting petitioner; (6) transportation of personnel to and from activities of charitable, civic, and social organizations to build company goodwill; (7) loan to schools for driver training programs; and (8) advertising and demonstration purposes.

Petitioner recorded the transactions involving the assignment of the automobiles to its employees on its books and records of account in the following manner. Upon the purchase of the automobiles from the manufacturer, it recorded the purchase costs in an account entitled "New Car Inventory" and, customarily upon the assignment of any of the autos to its employees, removed the cost of the cars assigned from that account and debited those costs to an account entitled "New Company Car Account." However, during 1955 the costs of the autos so assigned remained in the new car inventory account and were not subtracted therefrom until after the yearend.

During 1955, petitioner had on its books and records an account entitled "Service Trucks." At December 31, 1955, the following figures were carried by petitioner in this account, which included the date of acquisition:

| Type of vehicle | Date of acquisition |
|---|---|
| Wrecker | 1947 |
| ¾-ton express | 1952 |
| Route van | 1952 |
| Dodge truck | Nov. 30, 1955 |

During the taxable year in question, petitioner sold 485 new automobiles and 978 used automobiles. It assigned 55 new autos to various employees for company use. Of these 55 automobiles, 22 were

sold by petitioner during 1955. The following schedule contains the relevant information pertaining to the 22 autos sold during 1955:

*Cars assigned by petitioner to its officers, department heads, and equipment pool and sold during 1955 after being held by petitioner for more than 6 months*

| Date acquired and assigned | Serial No. | Cost at time of sale | Date of sale through Dec. 31, 1955 | Sales price |
|---|---|---|---|---|
| Dec. 1, 1954 | 34745378 | $2,535.37 | Nov. 15, 1955 | $3,577.80 |
| Dec. 1, 1954 | 34752777 | 2,412.94 | Dec. 5, 1955 | 2,700.00 |
| Dec. 1, 1954 | 34755741 | 2,302.18 | Sept. 26, 1955 | 3,270.00 |
| Dec. 3, 1954 | 34756005 | 2,631.11 | Nov. 14, 1955 | 3,402.85 |
| Dec. 3, 1954 | 34767182 | 2,196.42 | Oct. 19, 1955 | 3,041.05 |
| Dec. 3, 1954 | 34766519 | 2,244.55 | Nov. 9, 1955 | 3,107.85 |
| Dec. 22, 1954 | 15705846 | 2,162.66 | Nov. 10, 1955 | 2,953.55 |
| Jan. 31, 1955 | 34831828 | 2,925.81 | Aug. 2, 1955 | 3,944.80 |
| May 20, 1955 | 34915446 | 3,255.99 | Nov. 25, 1955 | 4,837.15 |
| May 20, 1955 | 34911056 | 2,907.23 | Dec. 2, 1955 | 3,970.40 |
| Mar. 22, 1955 | 34866340 | 3,186.79 | Dec. 9, 1955 | 4,215.85 |

*Cars assigned by petitioner to its officers, department heads, and equipment pool and sold during 1955 after being held by petitioner for less than 6 months*

| Date acquired and assigned | Serial No. | Cost | Date of sale through Dec. 31, 1955 | Sales price |
|---|---|---|---|---|
| Dec. 1, 1954 | 34754404 | $2,420.40 | Feb. 17, 1955 | $3,221.55 |
| Dec. 15, 1954 | 34774608 | 2,417.22 | Mar. 2, 1955 | 3,235.55 |
| Dec. 3, 1954 | 15665350 | 2,083.08 | Mar. 18, 1955 | 2,816.75 |
| Jan. 31, 1955 | 34819788 | 2,884.86 | June 27, 1955 | 3,946.85 |
| Mar. 9, 1955 | 34816082 | 2,202.50 | June 23, 1955 | 3,057.60 |
| May 20, 1955 | 34908966 | 3,341.08 | July 20, 1955 | 4,624.00 |
| May 20, 1955 | 34897006 | 2,435.99 | Oct. 19, 1955 | 3,350.95 |
| May 20, 1955 | 34910984 | 2,876.72 | Sept. 18, 1955 | 3,923.40 |
| May 20, 1955 | 34915288 | 2,893.90 | July 12, 1955 | 3,945.40 |
| July 12, 1955 | 34904046 | 2,716.49 | July 23, 1955 | 3,702.25 |
| Sept. 13, 1955 | 34770062 | 2,159.19 | Dec. 9, 1955 | 3,132.70 |

The following schedule contains relevant information pertaining to the 33 automobiles which were assigned to petitioner's employees and still owned by petitioner as of December 31, 1955:

*Information concerning cars assigned by petitioner to its officers, department heads, and equipment pool and held by petitioner at Dec. 31, 1955*

| Date acquired and assigned | Serial No. | Cost | Date acquired and assigned | Serial No. | Cost |
|---|---|---|---|---|---|
| Feb. 4, 1953 | 34544077 | $2,188.86 | Oct. 11, 1955 | 34994948 | $2,918.82 |
| July 3, 1953 | 34537433 | 2,322.21 | Oct. 17, 1955 | 34997658 | 2,989.51 |
| Dec. 1, 1954 | 34747431 | 2,416.25 | Oct. 3, 1955 | 34990423 | 2,616.17 |
| Dec. 1, 1954 | 34746354 | 2,413.77 | Oct. 31, 1955 | 35012991 | 2,664.18 |
| Dec. 3, 1954 | 34763663 | 2,628.95 | Oct. 17, 1955 | 35001239 | 2,360.21 |
| Dec. 15, 1954 | 34772916 | 2,680.96 | Oct. 11, 1955 | 34994099 | 2,624.22 |
| Dec. 22, 1954 | 15706086 | 2,157.64 | Dec. 5, 1955 | 35017448 | 2,576.10 |
| Jan. 31, 1955 | 34792921 | 2,818.52 | Dec. 10, 1955 | 35014309 | 2,416.51 |
| Jan. 31, 1955 | 34831394 | 2,880.24 | Dec. 13, 1955 | 35045695 | 2,759.11 |
| Mar. 1, 1955 | 34836790 | 2,870.90 | Dec. 14, 1955 | 35046599 | 2,763.81 |
| Sept. 8, 1955 | 34909696 | 2,843.26 | Dec. 14, 1955 | 35047265 | 2,746.82 |
| Nov. 29, 1955 | 34985548 | 2,685.31 | Dec. 19, 1955 | 35037220 | 2,578.06 |
| Nov. 29, 1955 | 35013224 | 2,576.44 | Dec. 21, 1955 | 35051478 | 2,996.21 |
| Nov. 30, 1955 | 34985814 | 2,693.43 | Dec. 21, 1955 | 35052378 | 3,139.83 |
| Nov. 30, 1955 | 34996839 | 2,672.23 | Dec. 21, 1955 | 35051493 | 3,005.38 |
| Nov. 30, 1955 | 35016433 | 2,686.20 | Dec. 21, 1955 | 35052090 | 3,211.94 |
| Sept. 29, 1955 | 34985784 | 2,707.49 | | | |

During 1953 petitioner had a total of 35 automobiles assigned at various times to its officers, department heads, and equipment pool.

Of these 35 automobiles, 18 were sold by petitioner in 1953. The following schedule contains the relevant information pertaining to the sale of these cars:

*Information concerning automobiles assigned by petitioner to its officers, department heads and an equipment pool during 1953*

| Date of acquisition | Serial No. | Cost of auto at time of sale | Date of sale through Dec. 31, 1953 | Sales price |
|---|---|---|---|---|
| June 26, 1950 | 31485756 | $2,749.44 | Dec. 11, 1953 | $1,997.00 |
| Oct. 30, 1952 | 38502421 | 2,627.67 | Feb. 2, 1953 | 3,370.23 |
| Nov. 29, 1952 | 34512457 | 2,429.95 | Oct. 7, 1953 | 3,059.01 |
| Nov. 29, 1952 | 34519182 | 2,638.31 | Sept. 24, 1953 | 3,413.12 |
| Dec. 3, 1952 | 34510466 | 2,443.85 | Dec. 31, 1953 | 3,140.87 |
| Dec. 3, 1952 | 38509175 | 2,846.15 | Oct. 20, 1953 | 3,477.65 |
| Dec. 19, 1952 | 38509482 | 2,642.07 | Oct. 6, 1953 | 3,304.35 |
| Dec. 23, 1952 | 32055133 | 2,174.07 | Sept. 29, 1953 | 2,781.10 |
| Jan. 5, 1953 | 38511740 | 2,638.30 | Aug. 25, 1953 | 3,330.28 |
| Feb. 12, 1953 | 34533486 | 2,363.33 | Sept. 8, 1953 | 2,962.95 |
| Feb. 4, 1953 | 34524814 | 2,830.75 | Sept. 8, 1953 | 3,450.26 |
| Feb. 6, 1953 | 34544077 | 2,188.86 | | |
| Feb. 12, 1953 | 34511295 | 2,330.90 | Sept. 23, 1953 | 2,909.55 |
| Feb. 12, 1953 | 34523900 | 2,383.85 | Nov. 19, 1953 | 2,993.13 |
| Feb. 12, 1953 | 32051560 | 1,977.16 | May 18, 1953 | 2,155.80 |
| Feb. 12, 1953 | 32051842 | 1,945.51 | May 12, 1953 | 2,095.00 |
| Mar. 5, 1953 | 34540310 | 2,302.76 | Nov. 23, 1953 | 2,882.09 |
| Mar. 17, 1953 | 32080625 | 2,181.11 | Sept. 3, 1953 | 2,730.39 |
| Mar. 31, 1953 | 34571045 | 2,392.09 | Oct. 19, 1953 | 3,013.19 |
| July 3, 1953 | 34537433 | | | |
| Nov. 18, 1953 | 34665594 | | | |
| Nov. 18, 1953 | 34671246 | | | |
| Nov. 18, 1953 | 34671295 | | | |
| Nov. 24, 1953 | 34676957 | | | |
| Dec. 23, 1953 | 34680264 | | | |
| Dec. 14, 1953 | 13591891 | | | |
| Dec. 4, 1953 | 13595192 | | | |
| Dec. 4, 1953 | 13597003 | | | |
| Dec. 4, 1953 | 13600111 | | | |
| Dec. 14, 1953 | 13607853 | | | |
| Dec. 31, 1953 | 13609071 | | | |
| Dec. 24, 1953 | 13622180 | | | |
| Dec. 24, 1953 | 13623970 | | | |
| Dec. 31, 1953 | 13625470 | | | |
| Dec. 31, 1953 | 13624353 | | | |

During 1954 petitioner had a total of 39 automobiles assigned at various times to its employees. Of these 39 automobiles, 22 were sold by the petitioner during 1954. The relevant information pertaining to the sale of these autos is contained in the following schedule:

*Information concerning automobiles assigned by petitioner to its officers, department heads, and an equipment pool during 1954*

| Date of acquisition | Serial No. | Cost of auto at time of sale | Date of sale through Dec. 31, 1954 | Sales price |
|---|---|---|---|---|
| Feb. 6, 1953 | 34544077 | | | |
| July 3, 1953 | 34537433 | | | |
| Nov. 18, 1953 | 34665594 | $2,552.60 | June 29, 1954 | $3,310.10 |
| Nov. 18, 1953 | 34671246 | 2,504.99 | Nov. 9, 1954 | 3,248.45 |
| Nov. 18, 1953 | 34671295 | 3,096.62 | Dec. 31, 1954 | 4,022.00 |
| Nov. 24, 1953 | 34676557 | 2,477.51 | July 29, 1954 | 3,213.10 |
| Dec. 23, 1953 | 34680264 | 2,402.71 | Nov. 2, 1954 | 4,179.55 |
| Dec. 14, 1953 | 13591891 | 1,613.98 | July 16, 1954 | 2,102.70 |
| Dec. 4, 1953 | 13595192 | 2,350.29 | July 16, 1954 | 3,065.00 |
| Dec. 4, 1953 | 13597003 | 2,366.56 | Oct. 18, 1954 | 3,063.85 |
| Dec. 4, 1953 | 13600111 | 2,442.44 | May 7, 1954 | 3,178.00 |
| Dec. 14, 1953 | 13607853 | 1,617.65 | July 23, 1954 | 2,106.45 |
| Dec. 31, 1953 | 13609071 | 1,601.50 | Aug. 17, 1954 | 2,099.35 |
| Dec. 24, 1953 | 13622180 | 1,915.46 | June 15, 1954 | 2,532.15 |
| Dec. 24, 1953 | 13623970 | 2,115.21 | Apr. 17, 1954 | 2,803.00 |

*Information concerning automobiles assigned by petitioner to its officers, department heads, and an equipment pool during 1954*—Continued

| Date of acquisition | Serial No. | Cost of auto at time of sale | Date of sale through Dec. 31, 1954 | Sales price |
|---|---|---|---|---|
| Dec. 31, 1953 | 13625470 | $1,644.69 | June 9, 1954 | $2,158.00 |
| Dec. 31, 1953 | 13624353 | 1,794.29 | June 1, 1954 | 2,352.35 |
| May 7, 1954 | 34712367 | 2,478.00 | June 21, 1954 | 3,281.20 |
| June 1, 1954 | 34670615 | 2,301.35 | July 12, 1954 | 3,015.00 |
| June 7, 1954 | 32168298 | ·2,131.60 | Sept. 3, 1954 | 2,772.95 |
| June 14, 1954 | 34718054 | 2,464.60 | Oct. 21, 1954 | 3,233.85 |
| June 24, 1954 | 34678966 | 2,987.52 | Aug. 31, 1954 | 3,897.70 |
| June 2, 1954 | 13729351 | 2,024.81 | July 29, 1954 | 2,604.90 |
| June 21, 1954 | 13639900 | 2,340.08 | Oct. 30, 1954 | 3,063.85 |
| Dec. 1, 1954 | 34745378 | | | |
| Dec. 1, 1954 | 34747431 | | | |
| Dec. 1, 1954 | 34752777 | | | |
| Dec. 1, 1954 | 34755741 | | | |
| Dec. 1, 1954 | 34754404 | | | |
| Dec. 3, 1954 | 34763663 | | | |
| Dec. 3, 1954 | 34756005 | | | |
| Dec. 3, 1954 | 34767182 | | | |
| Dec. 3, 1954 | 34766619 | | | |
| Dec. 15, 1954 | 34774608 | | | |
| Dec. 15, 1954 | 34772916 | | | |
| Dec. 1, 1954 | 34746354 | | | |
| Dec. 3, 1954 | 15665350 | | | |
| Dec. 22, 1954 | 15705846 | | | |
| Dec. 22, 1954 | 15706086 | | | |

On its income tax return for 1955 petitioner claimed an allowance for depreciation in the amount of $12,906.89 on 44 of the 55 automobiles sold during that year. Depreciation was computed on a straight-line method using a 4-year life. No salvage value was provided for. Of the 11 automobiles sold during 1955, but held for more than 6 months, petitioner claimed depreciation in the amount of $4,972.78. Respondent disallowed the entire amount of this depreciation. Petitioner claimed no depreciation on 11 other automobiles sold during 1955 which were held for less than 6 months. Of the 33 automobiles assigned to its employees and held at the yearend, petitioner claimed depreciation of $7,934.11. Respondent allowed depreciation on only two automobiles in the amount of $1,127.76 and disallowed the remaining amount.

On its income tax return for the taxable year 1955, petitioner deducted $13,896.27 as "Company Cars—Supplies & Expense" for expenses incurred in the operation of the 55 automobiles assigned to its various employees during that year.

OPINION

*Issues 2 and 3. Depreciation and Capital Gains*

On its income tax return for the taxable year 1955, petitioner claimed a depreciation deduction in the amount of $12,906.89 on 44 automobiles assigned to various employees for company use during that year, and claimed long-term capital gains treatment of $15,540.39 on the proceeds from the sale of 11 of said vehicles during 1955.

Respondent, in his notice of deficiency, allowed depreciation of $1,127.76 on 2 of said cars, and disallowed depreciation in the amount of $11,779.13 on the remaining 42 cars on the ground that the latter amount represents depreciation claimed on property held primarily for sale in the regular course of petitioner's trade or business and, therefore, not subject to a depreciation allowance.[8] Respondent also disallowed the capital gain of $15,540.39, and held that petitioner realized taxable ordinary income of $10,567.61 from the sale of the 11 so-called company cars during 1955 on the ground that said cars were purchased and held primarily for sale in the regular course of business. By amended answer filed at the trial, respondent further alleges that the depreciation in dispute is not allowable because the salvage value of the 42 company cars to petitioner exceeded petitioner's cost of such automobiles.

Challenging respondent's determination, petitioner contends that the 42 automobiles in question assigned to its officers, department heads, and an equipment pool during 1955 were property committed to general use in its trade or business within the intendment of section 1231, and that, therefore, said cars were depreciable assets under section 167 of the Code of 1954;[9] and further that gains on the sale of the 11 automobiles during 1955 (which had been used more than 6 months) were entitled to long-term capital gains treatment.

We are unable to agree with petitioner.

Respondent's determination is presumptively correct, and the burden to prove error is on petitioner. Whether property is used in the trade or business or is held primarily for sale to customers in the ordinary course of the taxpayer's trade or business within the meaning of section 1231, so as to preclude the depreciation allowance, is essentially a question of fact. *Johnson-McReynolds Chevrolet Corporation,*

---

[8] The part of sec. 1231(b) which defines "property used in the trade or business" and which is material herein is as follows:

SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS.

(b) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For purposes of this section—

(1) GENERAL RULE.—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not—

(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year,

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or

[9] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

27 T.C. 300, 304 (1956); *Latimer-Looney Chevrolet, Inc.*, 19 T.C. 120 (1952); and *W. R. Stephens Co.* v. *Commissioner*, 199 F. 2d 665 (C.A. 8, 1952), affirming a Memorandum Opinion of this Court.

The record shows that during 1955 none of the 42 automobiles in question were specifically acquired for use in petitioner's day-to-day business operations, but rather that said automobiles were acquired from the Chrysler Corp. primarily as stock in trade to be sold to its customers after temporary use in the business. Upon receipt of all new automobiles, petitioner, under its bookkeeping system, recorded the costs thereof in its accounting books and records in account 131 entitled "New Car Inventory." When one or more of the new automobiles were, after receipt, assigned by petitioner to its officers, department heads, and an equipment pool, the costs of the assigned automobiles were removed by petitioner from the new car inventory account and transferred to account 136 entitled "Demonstrator Inventory." By thus separating its inventory, petitioner assigned to its general business use 55 so-called company cars, which were the same make as those petitioner was franchised to sell, and which in some instances were admittedly unsuitable for the assigned use. Of said amount, petitioner sold 11 cars within 6 months after they were assigned to business use on the alleged ground that they were unsatisfactory for the particular use for which they had been devoted. All of the 11 cars were sold at a sales price in excess of cost. Petitioner claimed no depreciation on these 11 cars and reported the gain as ordinary income. Significantly, during 1955, the 42 automobiles in controversy were carried in the new car inventory on petitioner's books until petitioner's accountant corrected this alleged error when he made an audit of its books at the end of that year.

It is noteworthy that petitioner's president testified that during 1955 petitioner was unable to purchase as many new automobiles as it wanted. He further testified that when it was decided to sell one of the so-called company cars, it would be cleaned and placed "on the lot beside the showroom, segregated from the used cars, however." There is no evidence to explain why petitioner did not sell the cars in question as part of its regular used car stock. Apparently, petitioner did not consider the company cars in the same category as its used car stock, and was able to sell the company cars for more than the latter. As already stated, all of the 11 cars sold within 6 months after they were assigned to business use during 1955 were sold at a price in excess of cost. Likewise, all of the 11 cars assigned by petitioner to its personnel and sold during 1955 after being held by petitioner for more than 6 months were sold at a price in excess of cost. Petitioner's president, on cross-examination, testified that "every attempt" was made to sell the so-called company cars for more than cost and that

petitioner was successful in the majority of such sales. Luhring further testified that while it was unlikely to obtain as much money for a company car as for a new model exactly the same as the company car, it was "possible."

Viewing the evidence in its entirety, we are convinced that there was no unqualified or indefinite commitment of these assigned automobiles for use in petitioner's business. The 42 vehicles in question never lost their inventory character and remained, even after several thousand miles of business use to which they were assigned by petitioner, automobiles properly includable in the stock in trade and held for sale to customers in the ordinary course of business. Petitioner's president testified that with respect to some of the cars in question they were temporarily assigned because they may have been the "wrong cars" for the assigned use. He also testified that at the time of assignment he did not know which ones would be temporarily assigned because perhaps "it would work out that it would be suitable for the use." At best, from the record before us, we believe that there was merely a temporary assignment of the 42 cars for approximately a year or less to some type of crew in connection with petitioner's overall operations, but that the essential purpose for which they were originally acquired was never altered. Undoubtedly, petitioner, which employed an average of 80 to 90 employees during the taxable year, required for general company use more than the two company cars allowed by respondent as depreciable company property. Respondent's action in allowing only the two cars above referred to is not unrealistic, however, in view of the fact that during 1955 petitioner also had the use of 42 vehicles on temporary assignment for use by its officers, department heads, and equipment pool.

Significantly, petitioner's average period of use of its assigned automobiles over a 3-year term was only approximately 7.3 months or less than one-sixth of the 4-year total useful life of an automobile. Petitioner used a 4-year useful life for depreciation purposes for the taxable year 1955 but, on brief, avers that useful life of the automobiles in question was not ordinarily in excess of 1 year. A vehicle is not property used in the business if the dealer temporarily withdraws it from stock in trade for use in his business. Of the 55 automobiles assigned to company use during the taxable year involved, 22 of them or 40 percent were sold during 1955. Where the purpose is to sell the automobiles after use for such a small portion of their useful life, the period of use is clearly of a temporary nature only. *R. E. Moorhead & Son, Inc.*, 40 T.C. 704, 711 (1963). See sec. 1.167(a)–1(b), Income Tax Regs., and Rev. Rul. 60–15, 1960–1 C.B. 22, both promulgated after the taxable year involved, wherein respondent amplified his position with respect to depreciation.

We are mindful, of course, that property need not be permanently committed to use in the taxpayer's business. An automobile dealer who buys new cars for sale may take some of them out of inventory and put them to bona fide use over their reasonable life in the operation of his company's trade and the mere fact that he is in the automobile-selling business does not deprive him of the right to depreciate such vehicles over their useful life in his hands and sell them thereafter with all the benefits of section 1231. While recognizing that an automobile dealer may properly take some of his new cars out of stock in trade and use them in his business as depreciable assets, the Court of Appeals in *Duval Motor Co.* v. *Commissioner*, 264 F. 2d 548, 552 (C.A. 5, 1959), affirming 28 T.C. 42 (1957), emphasized that:

where such a dealer buys new cars for sale, puts them into inventory, later removes them temporarily [3] to be used by company officials and salesmen whose primary interest is to stimulate sales of all the dealer's cars, including these very cars in issue, we conclude that under the ordinary meaning of the words used in the statute the "primary" purpose for which the dealer holds the cars during the entire holding by it is for sale to its customers in the ordinary course of its business.

[3] The term "temporarily" as used by the Tax Court is attacked by the taxpayer as being unsubstantiated. Clearly where the purpose from start to finish is to sell the cars *after use of one-fourth or less of their useful life,* such short use is "temporary." [Emphasis added.]

Petitioner's president maintains that once a new car was assigned to business use it was no longer available for sale until it was deemed useless for the assigned purpose. Yet the record shows that 1 of the 55 new cars assigned to business use in 1955 (a Dodge, serial No. 34754404) and listed on the company books in an account denominated "Demonstrator Inventory" was sold to John T. Butler, a customer, on February 17, 1955. The customer testified that he told the salesman that he wished to purchase a particular type and color automobile and when the customer expressed a desire to purchase an automobile which happened to be assigned to Henry Luhring (parked in front of the showroom window on the street) the salesman told him that it was "Henry's demonstrator." Said automobile was sold to Butler after only 2 months and 17 days' use by petitioner. While this automobile may be 1 of the 11 cars for which no depreciation was claimed in 1955, we believe the particular sale establishes that there was not an unqualified commitment by petitioner of the 42 company cars in question for use in its day-to-day business operations.

Petitioner urges that respondent has in effect conceded that the 42 automobiles in question were assigned to company use at the time of acquisition and used in its trade or business (as capital assets) during 1955 since respondent allowed a deduction claimed by petitioner on its return for 1955 of $13,896.27 for "company cars—Sup-

plies and Expenses." In our opinion respondent's allowance of said amount is not necessarily an admission that said cars were assigned to petitioner's day-to-day operations as capital assets within the ambit of section 1231(b). Said expenditures could have been incurred in the normal upkeep and maintenance of these vehicles as part of petitioner's stock in trade, even though they were temporarily assigned to petitioner's general business use. There is no affirmative evidence in the record to show the exact nature of the "Supplies and Expenses" under review, and we cannot speculate as to their character.

In support of its position that it was entitled to capital gains treatment on the sale of the 11 so-called company cars sold in 1955, which had been held for more than 6 months prior to sale, petitioner relies on *Massey Motors, Inc.* v. *United States*, 364 U.S. 92 (1960), affirming 264 F. 2d 552 (C.A. 5, 1959). We have carefully considered this case and do not find it controlling herein. In *Massey*, the Government, in the District Court, lost the issue of whether assigned automobiles were held for sale in the ordinary course of the taxpayer's business or were section 1231 assets and, thereafter, elected not to appeal with respect to this factual issue. Consequently, this issue was not before the Supreme Court in *Massey*.

In view of the foregoing, we are convinced that the 42 automobiles in question were held by petitioner during the taxable year 1955 primarily for sale to customers in the ordinary course of its automobile sales business. Accordingly, we conclude that depreciation claimed by petitioner for 1955 with respect to said automobiles is not allowable under section 167(a), and that the gain which petitioner realized from the sale of the 11 cars in dispute (held for more than 6 months) is taxable as ordinary income.

In view of the above conclusions, there is no occasion to discuss the alternative contention raised by respondent, by amended answer, with respect to the salvage value of the 42 vehicles in question.

*Decision will be entered under Rule 50.*